[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
**July 21, 2004**
THOMAS K. KAHN
CLERK

No. 01-16723

D. C. Docket No. 99-10058-CV-JLK

STEVEN LOFTON,
DOUGLAS HOUGHTON,
TIMOTHY ACARO,
next friend of John Doe and John Roe,
WAYNE SMITH,
DANIEL SKAHEN,
JOHN DOE,
JOHN ROE,
minor children,

Plaintiffs-Appellants,

ANGELA GILMORE, et al.,

Plaintiffs,

versus

SECRETARY OF THE DEPARTMENT OF
CHILDREN AND FAMILY SERVICES,
(formerly H.R.S.), DISTRICT ADMINISTRATOR,
District XI of Florida Department of Children
and Family Services,

Defendants-Appellees.

CHARLIE CRIST,
Attorney General of the State of Florida,

                                        Defendant,

ROBERT PAPPAS, District Administrator,
District X of Florida Department of Children
and Family Services,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____
**(July 21, 2004)**

ON PETITION FOR REHEARING EN BANC
(Opinion Jan 28, 2004, _____)


Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and
PRYOR, Circuit Judges.

BY THE COURT:

The Court having been polled at the request of one of the members of the

Court and a majority of the Circuit Judges who are in regular active service not

having voted in favor of it (Rule 35, Federal Rules of Appellate Procedures;

Eleventh Circuit Rule 35-5), the Petition for Rehearing En Banc is DENIED.


                                        /s/ J L EDMONDSON
                                              Chief Judge

BIRCH, Circuit Judge, Specially Concurring in the Denial of Rehearing En Banc:

The dissents to the denial of rehearing *en banc* both agree that the Equal Protection Clause challenge to the Florida statute at issue should have been embraced by our court. After a review of the Supreme Court's decisions in *Eisenstadt*,[1] *Moreno*,[2] *Cleburne*,[3] and *Romer*,[4] the vociferous dissent by my sister jurist (for whom I have great respect and affection), liberally quoting from Justice O'Connor's *concurring* opinion in *Lawrence*,[5] concludes that under a rational basis analysis or, alternatively, an animus-motivated analysis, the Florida adoption statute at issue is constitutionally flawed. In addition to the discussion by the unanimous panel in *Lofton*, 358 F.3d 804, 817-827, that reaches a contrary conclusion, I would offer the following additional considerations to balance those suggested by Judge Barkett's spirited and well-crafted dissent.

The *Lofton* panel's analysis and approach in this case was premised on a fundamental principal or philosophy, articulated well by Justice Felix Frankfurter

---

[1] *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029 (1972).

[2] *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 93 S. Ct. 2821 (1973).

[3] *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 105 S. Ct. 3249 (1985).

[4] *Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620 (1996).

[5] *Lawrence v. Texas*, __ U.S. __, 123 S. Ct. 2472 (2003).

in his concurring opinion in *Dennis v. United States*, 341 U.S. 494, 525, 71 S. Ct. 857, 875 (1951), when he observed:

> Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. ... Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

The dissent, instead of approaching the issue as the panel did in this case by asking "[W]hether the Florida legislature *could* have reasonably believed that prohibiting adoption into homosexual environments would further its interest in placing adoptive children in homes that will provide them with optimal developmental conditions," *Lofton*, 358 F.3d at 820, seeks to disparage a fundamental rationale of the Florida *legislature*. Both the Florida attorney general and a Florida appellate court, specifically considering an equal protection challenge to the statute, articulated a rational and arguable basis for the statute: "[W]hatever causes a person to become a homosexual, it is clear that the state cannot know the sexual preferences that a child will exhibit as an adult. Statistically, the state does know that a very high percentage of children available for adoption will develop heterosexual preferences." Fla. Dep't of Health &

4

Rehab. Servs. v. Cox, 627 So.2d 1210, 1229 (Fla. Dist. Ct. App. 1993).  Stated differently, the mainstream of contemporary American family life consists of heterosexual individuals.  Can it be seriously contended that an arguably rational basis does not exist for placing adoptive children in the *mainstream* of American family life?  And that to do so is irrational?  I think not.  In fact, the Congress of the United States in determining what is in the best interests of other special needs children, the handicapped, has passed laws focused on educationally *mainstreaming* such children.  *See, e.g.*, 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled").

It is also worthy to note that the dissent would focus on conduct by Florida's *executive branch* (the Department of Children and Family Services ["the Department"]) and Florida's *judicial branch* (citing just two isolated custody determinations), which the dissent argues is inconsistent with the *legislature's* arguably rational bases.   Recall that the Supreme Court has held: "It could be that the assumptions underlying these rationales are erroneous, but the very fact that they are *arguable* is sufficient, on rational-basis review, to immunize the legislative choice from constitutional challenge."  *Heller v. Doe*, 509 U.S. 312,

5

333, 113 S. Ct. 2637, 2649-50 (1993) (citation and internal punctuation marks omitted) (emphasis mine). Moreover, post-legislation conduct, including the passage of regulations, by the executive agency that must find placements for parentless children, which may be at times inconsistent with the spirit, if not the letter, of a legislative enactment, should not weigh heavily in the calculus of rational basis review. The executive branch, acting through unelected bureaucrats who, while undoubtedly concerned about the best interests of their wards, often are motivated by other concerns such as coping with inadequate resources and an unmanageable number of unplaced children. As the *Lofton* panel recognized:

> The Equal Protection Clause of the Fourteenth Amendment proclaims that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. The central mandate of the equal protection guarantee is that "[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Roberston*, 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983). Equal protection, however, does not forbid legislative classifications. *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id*. Unless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). As we have explained, Florida's statute burdens no fundamental rights. Moreover, all of our sister circuits that have considered the question have declined to treat homosexuals as a suspect class.[16] Because the

6

present case involves neither a fundamental right nor a suspect class, we review the Florida statute under the rational-basis standard.

Rational-basis review, "a paradigm of judicial restraint," does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313-14, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (citation omitted). The question is simply whether the challenged legislation is rationally related to a legitimate state interest. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). Under this deferential standard, a legislative classification "is accorded a strong presumption of validity," *id.* at 319, 113 S.Ct. at 2642, and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *id*. at 320, 113 S.Ct. at 2642 (citation omitted). This holds true "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer*, 517 U.S. at 632, 116 S.Ct. at 1627. Moreover, a state has "no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller*, 509 U.S. at 320, 113 S.Ct. at 2643. Rather, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.* at 320-21, 113 S.Ct. at 2643 (citation omitted).

_____

[16]*Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289 (6th Cir. 1997); *Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126 (9th Cir. 1997); *Richenberg v. Perry*, 97 F.3d 256 (7th Cir. 1996); *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990); *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989); *Woodward v. United States*, 871 F.2d 1068 (Fed. Cir. 1989); *Town of Ball v. Rapides Parish Police Jury*, 746 F.2d 1049 (5th Cir. 1984); *Rich v. Sec'y of the Army*, 735 F.2d 1220 (10th Cir. 1984).

*Lofton*, 358 F.3d. at 817-18. Citing some inconsistent actions by Florida bureaucrats in the Department and two isolated Florida judicial decisions hardly meets the burden "to negative every conceivable basis which might support [the legislative arrangement], whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320-21, 113 S.Ct. at 2643.

The dissent also sets up a "straw man" when it suggests: "[t]he panel also intimates in dicta that Florida has a legitimate interest in defending public morality by expressing disapproval of homosexuality." Dissent (Barkett, J.) At __. The footnote was not motivated by some sort of homophobic agenda, but only acknowledged the argument advanced by Florida's counsel that public morality was a rational basis and thus the panel stated, given our finding of a mainstreaming rationale as a rational basis, that "it is unnecessary for us to resolve the question [of a public morality basis]." *Lofton,* 358 F.3d at 819.

Turning now from the dissent's attack on the rational basis predicate to its alternative "animus/analysis" challenge, I offer the following perspectives in counter-balance to the arguments by the dissent. The dissent advances a second equal protection argument in favor of striking down the Florida adoption statute's categorical prohibition against practicing homosexual citizens. As I understand the dissent's argument, once it is demonstrated that the motivation propelling a

8

piece of legislation is animus, a different sort of analysis from a traditional "any-existing-rational-basis-will-justify" approach must be employed, as putatively mandated by Supreme Court precedents in *Romer*, *Cleburne*, *Moreno* and *Eisenstadt*. Under this "animus/analysis," a court is required to examine whether the proffered reasons for the statute are pretextual—particularly in light of what the State (including its executive branch [here the Department] and judicial branch [courts awarding custody to homosexual parents, etc.]) does that is contradictory to the statute.

While a principled argument can be made on this equal protection animus/analysis that might result in invalidation of this statute, *see Shahar v. Bowers,* 114 F.3d 1097, 1125 (1997) (en banc) (Birch, J., dissenting), the *Lofton* panel was not willing to embrace that more adventurous leap and preferred to stay with a more traditional analytical approach that ignored the actual legislative history and instead searched for any rational basis.

The real point of disagreement between the *Lofton* panel and the dissent is whether rational-basis review should always uphold a law as long as there exists some "conceivable" rational basis—or whether there are certain instances that call for a "more searching" form of rational-basis review that examines the actual

9

motivations underlying the law.  Accordingly, I offer the counter-argument to the dissent's "heightened rational-basis review" theory.

The dissent's interpretation of *Romer*, *Cleburne*, *Moreno* and *Eisenstadt*—and its theory that these precedents call for a "more searching" form of rational-basis review—is summarized well in the following passage:

> In all four cases, the Court concluded that the asserted justifications were not rationally related to the classification. Thus, the Court inferred that animus was the motivation behind the legislation and established that such a motivation could not constitute a legitimate state interest.

Dissent (Barkett, J.) at ___.

Aside from Justice O'Connor's *Lawrence* concurrence, I have found in the Supreme Court's language no explicit support for the theory that rational-basis review should examine the actual motivation behind legislation (assuming that such a thing can be divined with any accuracy).  I also note the Supreme Court's own observation that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *F.C.C. v. Beach Communications. Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S. Ct. 925, 929 (1986) ("It is a familiar principle of constitutional law that this

10

Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.") (citation omitted).

Moreover, my review of the cases cited by the dissent fails to convince me that those opinions applied a "heightened" form of review as the dissent contends. In that vein, I offer my more conventional and measured reading of each of those precedents.

The *Romer* Court found Colorado's Amendment 2—a "sweeping and comprehensive" measure that imposed a "broad and undifferentiated disability" on the state's homosexual residents—to be "inexplicable by anything but animus" because the breadth of the Amendment so exceeded its proffered rationales. 517 U.S. 620, 116 S. Ct. 1620 (1996). As I understand it, the fatal defect in Amendment 2 was not that the Court determined that *actual* animus motivated passage of the Amendment. Indeed, in contrast to the dissent's scrutiny of the legislative history of the Florida statute, the *Romer* Court never examined the actual history of the plebiscite vote that led to passage of Amendment 2, nor the accompanying campaign rhetoric or the "intent" of the electorate.

Instead, the Court found the proffered rationales so implausible that the Court *inferred* that animus was the only conceivable (as opposed to

11

actual) rationale. *See id.* at 632, 116 S. Ct. at 1627 (The Amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects."). In its pivotal language, the Court stated:

> The primary rationale the State offers for Amendment 2 is respect for other citizens' freedom of association, and in particular the liberties of landlords or employers who have personal or religious objections to homosexuality. Colorado also cites its interest in conserving resources to fight discrimination against other groups. The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them. We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit.

*Id.* at 635, 116 S.Ct. at 1629.

In sum, I read *Romer* to stand for the proposition that when all the proffered rationales for a law are clearly and manifestly implausible, a reviewing court may infer that animus is the only explicable basis. And animus *alone* cannot constitute a legitimate government interest.

In *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 105 S. Ct. 3249 (1985), the Supreme Court invalidated, under the rational-basis test, a municipal zoning ordinance requiring a group home for the mentally

12

retarded to obtain a special use permit. *Id.* at 435, 105 S. Ct. at 3252.

Although the municipality offered various justifications for the ordinance,

the Court could not discern how these justifications applied particularly to

mentally retarded residents—but not to other groups of persons who could

freely occupy the identical structure without a permit, such as boarding

houses, fraternity houses, and nursing homes. *Id.* at 449-50, 105 S. Ct. at

3259-60.

*Cleburne* stands primarily for the proposition that irrational prejudice

is not a legitimate state interest. And irrational prejudice can be inferred as

the basis for a classification when there is no reason to believe that the

disadvantaged class is different, in relevant respects, from similarly situated

classes.

I would also note this recent gloss that the Court gave *Cleburne* in

*Bd. of Trustees of the Univ. of Alabama v. Garrett*:

> The [*Cleburne*] Court's reasoning was that the city's purported
> justifications for the ordinance made no sense in light of how the city
> treated other groups similarly situated in relevant respects. Although
> the group home for the mentally retarded was required to obtain a
> special use permit, apartment houses, other multiple-family
> dwellings, retirement homes, nursing homes, sanitariums, hospitals,
> boarding houses, fraternity and sorority houses, and dormitories were
> not subject to the ordinance.

531 U.S. 356, 366 n.4, 121 S. Ct. 955, 963 n.4 (2001). *Garrett* also

expressly rejected the theory that, under *Cleburne*, the mere presence of

animus can fatally taint a statute against a rational-basis challenge:

> Justice Breyer suggests that *Cleburne* stands for the broad proposition
> that state decisionmaking reflecting "negative attitudes" or "fear"
> necessarily runs afoul of the Fourteenth Amendment. Although such
> biases may often accompany irrational (and therefore
> unconstitutional) discrimination, their presence alone does not a
> constitutional violation make. As we noted in *Cleburne*: "[M]ere
> negative attitudes, or fear, *unsubstantiated by factors which are
> properly cognizable* in a zoning proceeding, are not permissible bases
> for treating a home for the mentally retarded differently ...."

*Id.* at 367, 121 S. Ct. at 964 (internal citations omitted) (emphasis added in

*Garrett).*[6]    In *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 93 S. Ct. 2821

(1973), the Court found that Section 3(a) the Federal Food Stamp Act, which

forbade assistance to any "household" wherein one member was unrelated to any

other member, was not rationally related to any legitimate state interest, including

the proffered reasons, such as fraud prevention. This led to the Court to conclude

that the only plausible rationale for the provision was to prevent hippie communes

from taking advantage of food stamp assistance. And this, by itself, was not a

---

[6] With regard to the argument that actual motivation is relevant on rational basis review, *Garrett* observes that "the State need not articulate its reasoning *at the moment a particular decision is made*. Rather, the burden is upon the challenging party to negative *any reasonably conceivable* state of facts that could provide a rational basis for the classification." *Id.* at 367, 121 S. Ct. at 964 (internal quotation marks omitted) (emphasis mine).

14

sufficient basis to sustain the provision: "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest . . . *without reference to some independent considerations in the public interest*." *Id.* at 534, 93 S. Ct. at 2826 (emphasis mine).

I call particular attention to a later gloss on *Moreno* expressly disclaiming the theory that *Moreno* stands for something more than traditional rational-basis review:

> [In *Moreno*,] we upheld an equal protection challenge to a provision of the Food Stamp Act and concluded that 'a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.' This statement is *merely an application of the usual rational-basis test*: if a statute is not rationally related to any legitimate governmental objective, it cannot be saved from constitutional challenge by a defense that relates it to an illegitimate governmental interest. Accordingly, in *Moreno* itself we examined the challenged provision under the rational-basis standard of review.

*Lyng v. United Auto. Workers of America*, 485 U.S. 360, 370 n.8, 108 S. Ct. 1184, 1192 n.8 (1988) (emphasis mine).

In *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029 (1972), the issue was whether a Massachusetts law that prevented dispensation of contraceptives to unmarried persons unless the purpose was to prevent disease violated the Equal Protection clause by treating married and unmarried persons differently. In

15

*Eisenstadt*, as in *Romer*, the fatal defect was not a determination that actual animus motivated the law, but that the proffered rationales were implausible. *See id.* at 449, 92 S. Ct. at 1036 ("Even on the assumption that the fear of pregnancy operates as a deterrent to fornication, the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim."). As I understand it, the *Eisenstadt* Court was not, as the dissent suggests, looking at the actual motivations behind the statute. Instead, the Court simply found that the proffered reasons did not rationally relate to the scope of the legislation and, accordingly, the classification failed rational-basis review.

The *Lofton* panel concluded its analysis with the following observation: "Florida has made the determination that it is not in the best interests of its displaced children to be adopted by [homosexuals] . . . and we have found nothing in the Constitution that forbids this policy judgment. Thus, any argument that the Florida legislature was misguided in its decision is one of legislative policy, not constitutional law. The legislature is the proper forum for this debate, and we do not sit as a superlegislature 'to award by judicial decree what was not achievable by political consensus.'" *Lofton*, 358 F.3d at 827 (citation omitted). The dissent would have this court impose its putatively superior judgment on this policy issue and legislate from the bench. Such a breach of the separation of powers and

16

departure from deference to the elected lawmakers of Florida, we have rejected. Only where the laws of Florida can be demonstrated to be irrational on any arguable basis or constitute a clear deprivation of a citizen's fundamental rights should this court substitute its judgment for that of the Florida legislature. Thus, I turn to the alternative analysis by one of the dissents that finds such a fundamental right having been articulated in the Supreme Court's decision in *Lawrence.*

The right to privacy that is the touchstone for a right to sexual intimacy by consenting adults (hereinafter "RSI/CA") has its Supreme Court lineage and trajectory through the decisions in *Griswold* (1965),[7] *Eisenstadt* (1972),[8] *Roe v. Wade* (1973),[9] and *Carey* (1977),[10] and culminating with *Lawrence* (2003) (which leveled the only speed-bump in that trajectory, *Bowers v. Hardwick* (1986)[11]). There seems to be only one problem with this theory, albeit in the form of a footnote:

> [T]he Court has not definitely answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating

---

[7] *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, (1965).

[8] *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029 (1972).

[9] 410 U.S. 113, 93 S. Ct. 705 (1973).

[10] *Carey v. Population Srvs. Int'l*, 431 U.S. 678, 97 S. Ct. 2010 (1977).

[11] 478 U.S. 186, 106 S. Ct. 2841 (1986).

> private consensual sexual behavior among adults, and we do not
> purport to answer that question now.

*Carey*, 431 U.S. at 688 n.5, 97 S.Ct. at 2018 n.5 (internal punctuation and citation omitted). I suggest that the answer to *Carey's* "difficult question" was not provided to us in *Lawrence* when viewed through an objective lens. I find that the most coherent lens through which to read *Lawrence* and its often enigmatic language is to recall that most of that language is devoted to explaining why the Court was not bound by its prior decision in *Bowers*. Perhaps the best way to explain this reading is to begin with the dissent's chief critique of the *Lofton* panel's interpretation of *Lawrence*. The dissent posits that the *Lofton* panel failed to recognize that *Lawrence* unequivocally held that consenting adults have a *substantive* due process right to engage in private intimate sexual conduct. This statement highlights well where the dissent and the *Lofton* panel part company. The first task in faithfully applying precedent, including that of the Supreme Court, is to look to the actual holding of the relevant precedent. That task requires examining the facts that were before the deciding court and ascertaining what conclusions of law were *necessarily* reached in disposing of the case.

A word-count approach as apparently employed by the dissent, in addition to being too formalistic, is problematic in practice. For example, my own unscientific survey of the words, phrases, sentences, and paragraphs used in *Lawrence* reveals not only language from which can be inferred a RSI/CA, but even stronger language from which we might infer any number of new rights, or even a new mandate in conducting constitutional review. *See, e.g.*, 123 S.Ct. at 2475 ("The instant case involves liberty of the person both in its spatial and more transcendent dimensions."); *id.* at 2481 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.") (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851, 112 S. Ct. 2791, 2807 (1992)); *id.* at 2483 ("[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.").

I realize these are outer examples, but they point to the importance of attentiveness to context in interpreting precedent—and in distinguishing binding language from advisory *dicta*. It was this distinction that the *Lofton* panel

19

carefully made in construing *Lawrence* and its holding: "*Lawrence*'s holding was that substantive due process does not permit a state to impose a criminal prohibition on private consensual homosexual conduct." *Lofton*, 358 F.3d at 815. I would add that this holding relied on two predicate legal conclusions: (1) that *stare decisis* did not require that *Bowers*'s precedent be followed and (2) that Texas's sodomy prohibition did not further a legitimate state interest. It was necessary for the Court to reach the first conclusion because *Bowers* had upheld Georgia's sodomy statute against, *inter alia*, a rational-basis challenge. And the second conclusion was all that was required to resolve the dispositive question of whether the Texas sodomy law was constitutional.

To read *Lawrence*'s holding any broader would be to assume that the Court departed from the established principle of minimalism in deciding constitutional matters. Of course, the Court will so depart from time to time, usually when announcing a new rule of constitutional law that will require frequent application by the lower courts (precedents like *Miranda v. Arizona*,[12] *Strickland v. Washington*,[13] and *BMW v. Gore*[14] come to mind). And those decisions are

_____

[12]384 U.S. 436, 86 S. Ct. 1602 (1966).

[13]466 U.S. 668, 104 S. Ct. 2052 (1984).

[14]*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589 (1995).

20

typically accompanied with clear guideposts for applying the new rule. *Lawrence* does not appear to be such a case. We find in the opinion no such guideposts; there is no description of the scope of this putative fundamental right, no standard of review for scrutinizing infringements on that right, no balancing test, and so on.

What we do find in the *Lawrence* opinion by way of mandate is that *Bowers* is no longer to be treated as good law. Indeed, *Bowers* is its constant point of reference, and the unrelenting thrust of *Lawrence's* analysis is to show that *Bowers* should not have reached the result it did. This begins in the first paragraph of the majority opinion's analysis, where the Court announced, "[W]e deem it necessary to reconsider the Court's holding in *Bowers*." 123 S. Ct. at 2476. Virtually the entire remainder of the opinion is focused upon explaining *Bowers*'s shortcomings, culminating in the pronouncement that "*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers v. Hardwick* should be and now is overruled." *Id.* at 2484. Having cleared *Bowers* from the books, the Court's analysis spends a mere two paragraphs on the facts of the *Lawrence* case—and disposes of the case in a single sentence: "The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Id.*

21

An important point bears noting here. To say that *Lawrence* overruled

*Bowers* is not to say that every question *Bowers* answered in the negative should

now be answered in the affirmative (or vice versa).[15] For example, although the

*Lawrence* Court specifically noted that *Bowers* misframed the issue as one of

whether there is a right to engage in sodomy, the Court never identified how

*Bowers* should in fact have framed the inquiry—much less what the precise

answer to that inquiry should have been. *Id.* at 2478. We see this pattern

throughout the *Lawrence* opinion. The opinion contains extensive critique of

*Bowers*'s answers to the questions raised in that case—but virtually no definitive

answers to those questions, much less rules of law. Another example is

*Lawrence*'s history discussion. After noting *Bowers*'s misframing of its inquiry,

the Court went on to point out some of the "fundamental criticisms of the

historical premises relied upon by the majority and concurring opinions in

*Bowers*." *Id.* ("Having misapprehended the claim of liberty there presented to it,

and thus stating the claim to be whether there is a fundamental right to engage in

consensual sodomy, the *Bowers* Court said: 'Proscriptions against that conduct

---

[15]For an even narrower interpretation of the extent to which *Bowers* was overruled, *see* Justice Scalia's dissent. Because the resolution of the instant case only required reaching the rational basis of the challenged statute, it was Justice Scalia's suggestion that *Lawrence* only overruled the rational-basis aspect of *Bowers*'s holding, but left intact its fundamental-rights holding. 123 S. Ct. at 2488 (Scalia, J., concurring).

have ancient roots.'"). Here, again, the Court only pointed to shortcomings in *Bowers*'s analysis, but did not reach any conclusions itself, noting that "[w]e need not enter this debate in the attempt to reach a definitive historical judgment, but the following considerations counsel against adopting the definitive conclusions upon which *Bowers* placed such reliance." *Id.*; *see also id.* at 2480 ("In summary, the historical grounds relied upon in *Bowers* are more complex than the majority opinion and the concurring opinion by Chief Justice Burger indicate. Their historical premises are not without doubt and, at the very least, are overstated.").

In short, the critique of *Bowers* provides the necessary context for understanding the great bulk of *Lawrence*'s language—including much of the language that the dissent quotes in support of its RSI/CA argument. For example, the dissent's main premise—that *Lawrence* "held that consenting adults have a right under the Due Process Clause to engage in private sexual conduct, including homosexual conduct," Dissent (Barkett, J.) at ___, relies heavily on the Court's analysis of the privacy cases preceding *Bowers*, namely, *Griswold*, *Eisenstadt*, *Roe*, and *Carey*.

Far from engaging in an extensive analysis, the Court spent less than a page surveying these precedents. 123 S. Ct. at 2476-77. More importantly, rather than put any definitive gloss on these precedents, the Court canvassed them in order to

23

point out that "[t]his was the state of the law with respect to some of the most relevant cases when the Court considered *Bowers v Hardwick*." *Id.* at 2477.

And so I return to my opening suggestion that the most coherent and objective lens through which to read *Lawrence* is to recall that the purpose of the vast bulk of its analysis was to call into question and ultimately overrule *Bowers*. Of course, this still leaves open the thorny question of to what extent the *Griswold* line of cases—which no longer must be reconciled with *Bowers*—establish a RSI/CA, as well as what standard of review that right would trigger. The question is further complicated by *Carey*'s footnote 5, which not only disavowed that those precedents had definitely established such a right, but also rejected the argument that strict scrutiny was the appropriate standard. *See* 431 U.S. at 688 n.5, 97 S.Ct. at 2018 n.5.

The dissent would have our court create a new fundamental substantive due process right where none has existed before. The *Lofton* panel and this court's rejection of *en banc* review has declined such an activist approach and has sought to "exercise the utmost care whenever . . . asked to break new ground" in the field of fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2268 (1997). I submit that the latter is the best advised course—particularly in this area where the Court appears to be breaking new ground, but has crafted its

24

opinions to avoid fashioning bright-line rules and to limit its holdings to the facts of the immediate case.[16] In my view, the most judicious way to follow such precedents is to apply their holdings to cases involving the same facts and permit the Supreme Court itself to clarify the gray areas it has apparently (and perhaps intentionally) left for another day. It may well be that the Court in time takes its jurisprudence in the direction that the dissent advocates. But that, in my opinion, is a step for the Supreme Court to take.

The *Lofton* panel chose not to expand *Lawrence* through inference and extrapolation, but rather applied the holding of *Lawrence* to the facts at hand. Our reading finds its legitimacy in the following passage from *Lawrence*, a passage in which the Court clearly limited the scope of its holding:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their

---

[16] *Cf. Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 1998 WL 101701 (6th Cir. Feb. *5,* 1998) (Boggs, J., concurring in denial of rehearing en banc) ("Even the staunchest proponents of the Supreme Court's decision in *Romer v. Evans* readily admit that the Court in that case purposely crafted a narrow opinion focused on the precise factual situation presented by Colorado's Amendment 2.") (citation omitted).

existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Casey*, *supra*, at 847, 112 S. Ct 2791. The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

123 S. Ct. at 2484.

As the *Lofton* panel explains, this case is different from *Lawrence* because this is not a criminal prosecution, because the state is not attempting to intervene in the private lives of any adults, because adoption is not a private act but a public one, and because, when it permits people to adopt, the state confers official status on them as adoptive parents. 358 F.3d at 817 ("the asserted liberty interest is not the negative right to engage in private conduct without facing criminal sanctions, but the affirmative right to receive official and public recognition"). This case is different from *Lawrence*, the *Lofton* panel opinion points out, because Florida's statute does further a legitimate state interest. It furthers the legitimate interest the state has in encouraging what it deems to be the optimal family structure, a home that has both a mother and a father, *id.* at 819-20, or at least one parent in the heterosexual mainstream of American family life. The plaintiffs did not seriously contest the legal sufficiency of that state interest, but instead argued that the

26

Florida law is not rationally related to that interest, an argument that the panel opinion thoroughly addresses. *Id.* at 820-26.

The dissent places great emphasis on the fact that the Court announced at the beginning of its opinion that "the case should be resolved by determining whether the petitioners were free as adults to engage in [their] private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Lawrence*, 123 S.Ct. at 2476. According to it, this language, along with the Court's other references to due process "liberty," requires that we interpret *Lawrence* as affirming a fundamental or substantive due process right to private consensual adult intimacy. It contends that this, in turn, requires that we subject the challenged Florida statute to "heightened scrutiny."[17]

Then the dissent makes two related assumptions. First, it conflates substantive due process analysis and fundamental rights analysis—or at least treats the two as interchangeable. Second, it assumes that *Lawrence*'s references to "liberty under the Due Process Clause" are tantamount to acknowledgment of a constitutional right deserving strict scrutiny protection. Upon close scrutiny, neither assumption is sound.

---

[17]The dissent repeatedly refers to this "heightened scrutiny," but never expressly specifies what standard of review it would entail. However, it appears to be strict scrutiny. *See* Dissent (Barkett, J.) at ___ ("a compelling and narrowly tailored justification").

Admittedly, there is considerable overlap between substantive due process analysis and fundamental rights analysis. And the Supreme Court has at times used the term "substantive due process" as shorthand for its fundamental rights analysis. But a careful reading of the Court's precedents indicates that its fundamental rights jurisprudence is but one subset of the various doctrines that emanate from the concept of substantive due process.

As our Chief Judge has noted, "In its application, substantive due process is a puzzling concept." *McKinney v. Pate*, 20 F.3d 1550, 1567 (11th Cir. 1994) (Edmondson, J., concurring). And even if I had the chutzpah to try, this would hardly be the place to solve that puzzle. I will, however, sketch a few principles that underlie my belief that there is no contradiction between the notion that *Lawrence* employed substantive due process analysis and the *Lofton* panel's conclusion that *Lawrence*'s holding was a rational-basis holding.

As an initial matter, I would suggest that rational-basis review—like every standard of review that scrutinizes the substance of state action for irrationality and arbitrariness—is itself a form of substantive due process review. Although it is rarely classified as such, I find no other plausible constitutional source for its substantive review of state and federal legislative acts. Indeed, "the touchstone of due process is protection of the individual against arbitrary action of

28

government.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S. Ct. 1708, 1716 (1998). And it has long been understood that the concept of due process protects against not only procedural arbitrariness, but also substantive arbitrariness.[18] *See Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986) ("And by barring certain government actions regardless of the fairness of the procedures used to implement them, [the due process guarantee] serves to prevent governmental power from being used for purposes of oppression.").

As I understand it, this substantive scrutiny of governmental action is the primary source of the Court's jurisprudence regarding fundamental, or unenumerated, rights (hereinafter, simply "fundamental rights"). However, the concept of substantive due process underlies other doctrines outside the field of fundamental rights. For example, I note that just last term the Court reaffirmed its line of cases holding that there are "substantive constitutional limitations" on the

---

[18] In *Lewis*, the Court stated:

We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, *see, e.g.*, *Daniels v. Williams*, 474 U.S. at 331 (the *substantive due process guarantee* protects against government power arbitrarily and oppressively exercised). While due process protection in the *substantive* sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.

523 U.S. at 845, 118 S. Ct. at 1716 (internal citations omitted) (emphasis mine).

size and severity of civil punitive damage awards. *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003).[19] Another example is the "shocks the conscience" test, under which courts consider whether the substance of actions by governmental officers is fatally arbitrary.[20]

I note these examples to underscore my point that rational-basis review likewise is a form of substantive review, albeit a deferential one, that protects against the arbitrary and irrational exercise of legislative power in enacting economic and social legislation. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 766, 117 S. Ct. 2258, 2282 (1997) (Souter, J., concurring) (canvassing the

---

[19]*See also State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519-20 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."); *id.* at 417, 123 S.Ct. at 1520 ("Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes *substantive* limits on that discretion") (internal quotation marks omitted) (emphasis mine).

[20]*See, e.g.*, *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1716 ("[I]n *Collins v. Harker Heights*, we said again that the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.") (internal citation and quotation marks omitted); *id.* at 850, 118 S. Ct. at 1718-19 ("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking."); *Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S. Ct. 1061, 1070 (1992) (reasoning that city's failure to properly warn its employees about known risks of harm was not "conscience shocking, in a constitutional sense"); *United States v. Salerno*, 481 U.S. 739, 746, 107 S. Ct. 2095, 2101 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience.'"); *Rochin v. California*, 342 U.S. 165, 169, 72 S. Ct. 205, 208 (1952) ("Due process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are so rooted in the traditions and conscience of our people as to be ranked as fundamental, . . . or are implicit in the concept of ordered liberty.") (internal citations and quotation marks omitted).

history of substantive due process and describing rational-basis review as one method, along with fundamental rights analysis, and scrutinizing state action for arbitrariness).[21] Accordingly, unlike the dissent, I do not find any incompatibility between (a) the *Lawrence* Court's assertion that "the case should be resolved by determining whether the petitioners were free as adults to engage in [their] private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution" and (b) the *Lofton* panel's conclusion that the Court ultimately based its holding on rational-basis grounds.

With regard to the dissent's second implicit assumption, I would submit that the mere fact that a liberty interest receives substantive protection under the Due Process Clause does not automatically trigger strict scrutiny. Based on its interpretation that *Lawrence* recognizes a substantive liberty interest, the dissent contends that any burden to that liberty interest requires strict scrutiny. Its chief exhibits are various lines from *Lawrence* that allude to the petitioners' liberty

---

[21]The Supreme Court's language in *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 113 S. Ct. 2264 (1993), illustrates well this overlap between substantive due process and rational-basis review. The *Concrete Pipe* Court upheld an ERISA provision against, *inter alia*, what the Court described as a "substantive due process" challenge. Although characterizing its analysis as substantive due process analysis, the Court applied classic rational-basis review in upholding the provision. Noting "the deferential standard of review applied in substantive due process challenges to economic legislation," *id.* at 639, 113 S. Ct. at 2288, the Court concluded that the challenged statute was "rationally related to the terms of Concrete Pipe's participation in the Plan it joined and that suffices for *substantive due process* scrutiny of this economic legislation," *id.* at 641, 113 S. Ct. at 2289 (emphasis mine).

31

under the Due Process clause. *See, e.g.*, *Lawrence*, 123 S. Ct. at 2476 ("We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution."); *id.* at 2478 ("The liberty protected by the Constitution allows homosexual persons the right to make this choice."); *id.* at 2484 ("Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.").

The dissent translates these general references to "liberty" under the Due Process Clause into a specific due process right to engage in private sexual conduct. The dissent appears to be: (multiple references to Due Process liberty) + (decision finding Texas sodomy statute unconstitutional) = (holding that there is a substantive due process right to sexual intimacy). But even if I were persuaded that *Lawrence* announced, or "reaffirmed," a substantive due process right to sexual intimacy, I still am not convinced that burdens on this right necessarily would require strict scrutiny. First, as the *Lofton* panel observed, the *Lawrence* Court itself never applied, nor used any of the language of, strict scrutiny. *Lofton*, 358 F.3d at 817. Second, with all due respect, as cryptic as some of the Supreme Court's substantive due process precedents are, my recent review of them

convinces me of this much: the mere presence of a substantive liberty interest does not automatically trigger strict scrutiny, as the dissent seems to suggest.

Indeed, even cursory research has revealed several instances in which the Court identified a substantive right under the Fourteenth Amendment—and yet did not require strict scrutiny. I note briefly two examples. The most recent is *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174 (2003), issued only days before the *Lawrence* opinion. The *Sell* Court vacated the conviction of a murder defendant who had been administered antipsychotic medication against his wishes in order to render him competent to stand trial. What I find significant is that the Court identified a "*constitutionally protected liberty interest* in avoiding the unwanted administration of antipsychotic drugs," *id.* at 178, 123 S. Ct at 2183 (internal quotation marks omitted) (emphasis mine), and then proceeded to articulate a standard of review lower than strict scrutiny—"necessary significantly to further important governmental trial-related interests," *id.* at 179, 123 S. Ct. at 2185.

The second case I note is *City of Chicago v. Morales*, 527 U.S. 41, 119 S. Ct. 1849 (1999). There, the plurality opinion recognized, in language similar to that employed in *Lawrence*, that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 53, 119 S. Ct. at 1857. *See also id.* at 54, 119 S. Ct. at 1858

33

("[A]n individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage.'").  I call attention to the fact that, despite using this substantive due process language, the *Morales* plurality never hinted at the applicability of strict scrutiny (and instead struck down Chicago's gang loitering statute on vagueness grounds—a decision that nevertheless was predicated on the existence of this "constitutionally protected liberty" to loiter innocently, *id.* at 55, 119 S. Ct. at 1858).[22]

In sum, a closer and careful reading of *Lawrence* and other relevant precedents indicate that, even if *Lawrence*'s *dicta* did acknowledge a

---

[22]Also, in a somewhat older case, *Youngberg v. Romeo*, the Court examined "for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment."  457 U.S. 307, 314, 102 S. Ct. 2452, 2457 (1982).  The Court concluded that the respondent, an institutionalized mental incompetent, "enjoy[ed] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  *Id.* at 324, 2462 S. Ct. at 2462.  Throughout its opinion, the Court referred to the respondent's substantive liberty interests—yet never treated this liberty as meriting strict scrutiny.  *See, e.g.*, *id.* at 315, 102 S. Ct. at 2458 ("the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause"); *id.* ("liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action") (internal punctuation omitted); *id.* at 318, 102 S. Ct. at 2459 ("we have recognized that there is a constitutionally protected liberty interest in safety and freedom from restraint").  Having "established that [the respondent] retain[ed] liberty interests in safety and freedom from bodily restraint," the Court turned to the question of the proper standard for determining whether his "substantive right protected by the Due Process Clause ha[d] been violated."  *Id.* at 319, 102 S. Ct. at 2460.  The Court ultimately employed a standard of review considerably lower than strict scrutiny (whether the State exercised professional judgment in protecting the rights of its involuntarily committed mentally retarded citizens).  *Id.* at 321, 102 S. Ct. at 2461.

constitutional liberty interest in private sexual intimacy, this liberty interest does not rise to the level of a fundamental right nor does it necessarily trigger strict scrutiny.

I will conclude on a purely personal note. If I were a legislator, rather than a judge, I would vote in favor of considering otherwise eligible homosexuals for adoptive parenthood. In reviewing the record in this case one can only be impressed by the courage, tenacity and devotion of Messrs. Lofton and Houghton for the children placed in their care. For these children, these men are the only parents they have ever known. Thus, I consider the policy decision of the Florida legislature to be misguided and trust that over time attitudes will change and it will see the best interest of these children in a different light. Nevertheless, as compelling as this perspective is to me, I will not allow my personal views to conflict with my judicial duty—conduct that apparently fewer and fewer citizens, commentators and Senators seem to understand or appreciate. And, I hasten to add, the vast majority of federal judges, including each and every judge of the Eleventh Circuit, are similarly sensitive to separate their personal preferences from their duty to follow precedent as they understand it.

ANDERSON, Circuit Judge, Dissenting from the Denial of Rehearing En Banc in which DUBINA, Circuit Judge, joins:

I agree with Judge Barkett that the cases she discusses in Section I of her comprehensive dissent indicate that the challenged provision of the Florida statute violates the Equal Protection Clause. For this reason, and because the issue is of exceptional importance, Fed.R.App.P. 35(a)(2), en banc rehearing should be granted.

BARKETT, Circuit Judge, Dissenting from the Denial of Rehearing En Banc:

Lofton v. Sec. of Dep't of Children & Family Services, 358 F.3d 804 (11th Cir. 2004), finds constitutional 1977 Fla. Laws, ch. 77-140, § 1, Fla. Stat. § 63.042(3) (2003), which provides that "[n]o person eligible to adopt under this statute may adopt if that person is a homosexual."[1]  Florida is the only state in the union to have such a categorical statutory prohibition targeted solely against homosexuals.[2]  This provision finds, as a matter of law, hundreds of thousands of Florida citizens unfit to serve as adoptive parents solely because of constitutionally protected conduct.  There is no comparable bar in Florida's adoption statute that applies to any other group.  Neither child molesters, drug addicts, nor domestic abusers are categorically barred by the statute from serving as adoptive parents.  In a very real sense, Florida's adoption statute treats homosexuals less favorably than even those individuals with characteristics that may pose a threat to the well-being of children.

---

[1] For purposes of this statute, the term "homosexual" is "limited to applicants who are known to engage in current, voluntary homosexual activity."  Fla. Dep't of Health & Rehab. Servs. v. Cox, 627 So. 2d 1210, 1215 (Fla. Dist. Ct. App. 1993), aff'd in relevant part, 656 So. 2d 902, 903 (Fla. 1995).

[2] Since 2000, Mississippi has statutorily prohibited "adoption by couples of the same gender."  Miss. Code Ann. § 93-17-3(2) (2000).  In 1999, Arkansas adopted a regulation, not a statute, barring homosexuals from becoming foster parents, not adoptive parents.  Ark. Reg. 200.3.2 (1999).

While Florida claims that it has singled out homosexuals because it wishes to limit adoptions to married couples, the statute in this case says absolutely nothing about married couples. In fact, Florida's adoption statute expressly provides for single persons to adopt. A full twenty-five percent of adoptions out of foster care in Florida are by single people; in the district covering Miami-Dade County, this figure is over forty percent.[3] This is only the first and most glaring of numerous gaps between the state's ban on homosexual adoption and its purported justification. Under Florida law, for example, single persons who are homosexuals but are "not practicing" may adopt.[4] Florida also permits homosexuals (whether sexually active or not) to serve as foster parents on a permanent basis,[5] and the state acknowledges that such foster care placements involve a state of "*de facto* permanency."[6] Finally, Florida permits homosexuals to serve as legal guardians.[7]

The ban on homosexual adoption at issue here violates the Equal Protection Clause of the Fourteenth Amendment because Florida's proffered rational basis is

---

[3] R. at 124 (Stipulation at ¶¶ 24-25).

[4] See note 1 above.

[5] See 2000 Fla. Laws, ch. 2000-139, § 30, Fla. Stat. § 39.623 (2003).

[6] R. at 24 (Defs.' Mot. to Dismiss at 10).

[7] R. at 124 (Stipulation at ¶¶ 9-11).

expressly refuted by the state's own law and practice and because a class consisting of all homosexual citizens was targeted solely on the basis of impermissible animus. Thus, as argued in Section I below, even under the lowest standard of review – rational basis – Florida's statute fails to survive equal protection analysis under the Supreme Court's precedents in Eisenstadt,[8] Moreno,[9] Cleburne,[10] and Romer.[11]

The state's ban on homosexual adoption also violates the Due Process Clause by conditioning access to the statutory privilege of adoption on surrender of the right to engage in private intimate sexual conduct protected by Lawrence v. Texas, 123 S. Ct. 2472 (2003). As argued in Section II below, in upholding the Florida statute, Lofton directly conflicts with an entire body of substantive due process jurisprudence, culminating in the Supreme Court's decision in Lawrence.

Because of these equal protection and substantive due process precedents, and in light of the "exceptional importance" of the issues raised, this decision clearly warrants en banc review. 11th Cir. R. 35-3 (en banc consideration is

---

[8] Eisenstadt v. Baird, 405 U.S. 438 (1972).

[9] U.S. Dep't of Agric. v. Moreno, 413 U.S. 528 (1973).

[10] City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985).

[11] Romer v. Evans, 517 U.S. 620 (1996).

warranted for "precedent-setting error[s] of exceptional importance" or for opinions that are "allegedly in direct conflict with precedent of the Supreme Court or of this circuit").

## I. Equal Protection

**A. The Rational Basis Test Established in the Analogous Cases of <u>Romer</u>, <u>Cleburne</u>, <u>Moreno</u>, and <u>Eisenstadt</u> Requires that We Invalidate this Statute.**

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." <u>Cleburne</u>, 473 U.S. at 439. Yet because of the practical need for legislators to draw distinctions among groups, a classification that neither burdens a fundamental right nor targets a suspect class will be analyzed using rational basis scrutiny, which means that it will be upheld provided that it "bears a rational relation to some legitimate end." <u>Romer</u>, 517 U.S. at 631. Although this is a deferential form of review, a court must still identify legitimate state interests and find a "relationship between the classification adopted and the object to be attained." <u>Id.</u> at 632.

As will be explained more fully below, the classification at issue in this case burdens personal relationships and exudes animus against a politically unpopular group. Under these circumstances, statutes have consistently failed rational basis

40

review.  Summarizing these cases, Justice O'Connor observed in her concurrence

in <u>Lawrence</u> that

> [l]aws such as economic or tax legislation that are scrutinized under rational
> basis review normally pass constitutional muster, since the Constitution
> presumes that even improvident decisions will eventually be rectified by the
> democratic processes.  We have consistently held, however, that some
> objectives, such as a bare . . . desire to harm a politically unpopular group,
> are not legitimate state interests.  <u>When a law exhibits such a desire to harm
> a politically unpopular group, we have applied a more searching form of
> rational basis review to strike down such laws under the Equal Protection
> Clause</u>.

<u>Lawrence</u>, 123 S. Ct. at 2484-85 (O'Connor, J., concurring) (internal citations and

quotation marks omitted) (emphasis added).  Justice O'Connor went on to explain

how this principle has been applied by the Court in prior equal protection cases:

> <u>We have been most likely to apply rational basis review to hold a law
> unconstitutional under the Equal Protection Clause where, as here, the
> challenged legislation inhibits personal relationships</u>.  In <u>Department of
> Agriculture v. Moreno</u>, for example, we held that a law preventing those
> households containing an individual unrelated to any other member of the
> household from receiving food stamps violated equal protection because the
> purpose of the law was to discriminate against hippies.  The asserted
> governmental interest in preventing food stamp fraud was not deemed
> sufficient to satisfy rational basis review.  In <u>Eisenstadt v. Baird</u>, we refused
> to sanction a law that discriminated between married and unmarried persons
> by prohibiting the distribution of contraceptives to single persons.
> Likewise, in <u>Cleburne v. Cleburne Living Center</u>, we held that it was
> irrational for a State to require a home for the mentally disabled to obtain a
> special use permit when other residences – like fraternity houses and
> apartment buildings – did not have to obtain such a permit.  And in <u>Romer
> v. Evans</u>, we disallowed a state statute that impos[ed] a broad and
> undifferentiated disability on a single named group – specifically,

41

homosexuals. <u>The dissent apparently agrees that if these cases have</u> stare decisis <u>effect, Texas' sodomy law would not pass scrutiny under the Equal Protection Clause, regardless of the type of rational basis review that we apply.</u>

Id., 123 S. Ct. at 2484-85 (emphasis added). An examination of these cases bears out Justice O'Connor's point and their direct application here. Regardless of how one labels the rational-basis review employed in these cases, Florida's ban on gay adoption is simply not compatible with them.

All four of these precedents involved legislation targeting politically unpopular groups to varying degrees: "hippies" (<u>Moreno</u>), unmarried users of birth control (<u>Eisenstadt</u>), the mentally disabled (<u>Cleburne</u>), and homosexuals (<u>Romer</u>). Moreover, in each case, the Court invalidated a law that had the effect of inhibiting personal relationships of one sort or another: among mentally disabled or unrelated persons who wished to share a common living space (<u>Cleburne</u> and <u>Moreno</u>); among unmarried individuals who wished to engage in intimate relations (<u>Eisenstadt</u>); and among individuals who wished to live without fear of state-sanctioned discrimination prompted solely by their attachment to persons of the same sex (<u>Romer</u>).

In <u>Moreno</u>, the Supreme Court found that excluding individuals unrelated to other household members from the federal food stamp program was not rationally

related to the government's asserted interest in minimizing administrative fraud.

413 U.S. at 535. In so finding, the Court observed that

> even if we were to accept as rational the Government's wholly
> unsubstantiated assumptions concerning the differences between
> 'related' and 'unrelated' households we still could not agree with the
> Government's conclusion that the denial of essential federal food
> assistance to all otherwise eligible households containing unrelated
> members constitutes a rational effort to deal with these concerns.

Id. at 535-36. The Court pointed out that the statute already contained anti-fraud

provisions and that it provided for strict criminal penalties. Id. at 536.

Furthermore, the Court found that in "practical effect," the statute did not operate

to further the prevention of fraud, since it only precluded groups that lived as one

economic unit, shared common cooking facilities, and customarily purchased food

in common. Id. at 537. The Court found that individuals with the financial means

to alter their living arrangements could avoid the exclusion by sidestepping any

one of the three conditions. For example, two wealthy unrelated individuals living

together could manage to purchase their groceries separately. In so doing, they

would effectively create two separate households, both eligible for assistance, and

thereby evade the application of the statute. Id. This being the case, it could not

truthfully be said that the purpose of the exclusion was to eliminate the operation

of fraud in the food stamp program. Instead, the statute irrationally punished

43

"only those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility." Id. at 538.

In Eisenstadt, the Court invalidated on rational basis grounds a Massachusetts statute banning the distribution of contraceptives to unmarried persons. The state's highest court had defined the statute's purposes as the deterrence of premarital sex and the promotion of community health needs by regulating the distribution of potentially harmful articles. The Supreme Court looked behind the facial legitimacy of the state's proffered justifications and refused to accept that either rationale could "reasonably be regarded" as the purpose of the statute. 405 U.S. at 448-49. The Court found that the first purpose, deterring premarital sex, was "dubious" considering that Massachusetts law did not limit the distribution of contraceptives when used to prevent the spread of disease rather than to prevent pregnancy. Id. (internal quotation omitted). And in allowing married persons to use contraceptives, the state's law made no effort to limit illicit sexual relations between married and unmarried persons. Thus, the proffered rational basis was "illogical to the point of irrationality." Id. at 451 (internal quotations omitted).[12]

---

[12] As the Court explained, if the state genuinely considered contraceptives to pose a health risk, it would have banned their use by both married and unmarried persons. Protecting only single persons from the alleged dangers of contraceptives, and even then only when used to prevent

The Court concluded that "the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim." Id. at 449. The Eisenstadt Court also discounted the state's promotion of health argument as "both discriminatory and overbroad," and a transparent effort to escape the reach of the Court's holding in Griswold v. State of Connecticut, 381 U.S. 479 (1965). Eisenstadt, 405 U.S. at 450. The Court held on equal protection grounds that "whatever the rights of the individual to access to contraceptives may be, the rights must be the same for the unmarried and the married alike." Id. at 453.

In Cleburne, the Court heard an equal protection challenge to a Texas city's zoning ordinance that required a special use permit in residential areas for the operation of a home for the mentally disabled. The city argued that the ordinance was justified by the "negative attitude of the majority of property owners" toward institutions for the mentally disabled and by "the fears of elderly residents" living near the institution. 473 U.S. at 448. It also defended the measure as an effort to serve the best interests of the mentally disabled themselves, arguing that the institution would be threatened by its location near a junior high school whose

pregnancy rather than the spread of disease, was "illogical to the point of irrationality." Eisenstadt, 405 U.S. at 451 (internal quotations omitted).

students might harass the residents, its setting on a flood plain, and its size and capacity. Finally, the city pointed to concerns over street congestion, fire hazards, neighborhood serenity, and potential liability arising out of the conduct of the mentally disabled. Id. at 449-50.

Again applying rational basis review, the Supreme Court first rejected the city's attempt to justify the statute by reference to a supposed communal aversion to the mentally disabled. "[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding," the Court found, "are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." Id. at 448.

With respect to the city's other arguments, the Court "did not discount the legitimacy of these interests, but rather found that, in creating the means used to carry out these interests, the city had adopted a classification that had no rational basis." Williams v. Pryor, 240 F.3d 944, 952 (11th Cir. 2001) (discussing Cleburne). The city's fears that junior high school students would harass the residents could not be credited because the junior high school itself had thirty mentally retarded students in attendance. Cleburne, 473 U.S. at 449. The concern of a possible flood was not tenable because the zoning ordinance allowed nursing homes, homes for the elderly, sanitariums, and hospitals to be located in the same

46

area without permits.  Id.  The city's fear of legal liability could not be credited

because fraternities and boarding houses did not require a permit.  Id.  Moreover,

fear of overcrowding in the institution was not reasonable when the city did not

require permits to protect against crowding in other facilities.  Id. at 450.  Finally,

there was no reason to believe that the institution would contribute to street

congestion more than any other similar institution.  What the Court said of this last

argument applied with equal force to all of the city's other rationales:

> [T]his record does not clarify how . . . the characteristics of the
> intended occupants of the Featherston home rationally justify denying
> to those occupants what would be permitted to groups occupying the
> same site for different purposes.

Id.

After discounting any connection between plausible legitimate government

interests and the statute in question, the Court concluded that "[t]he short of it is

that requiring the permit in this case appears to us to rest on an irrational prejudice

against the mentally retarded."  Id.  In Cleburne, as in Eisenstadt, the Supreme

Court indicated that it simply disbelieved that the purposes articulated by the state

had any rational relationship to the ordinance and refused to accept the facial

legitimacy of the city's proffered reasons.  The Court held that none of the goals

fit the class of persons targeted except by way of confirming that animus towards the mentally disabled had been the major impetus behind the statute.

Finally, in <u>Romer</u> the Court extended rational basis review to the area of anti-homosexual discrimination.  Colorado argued that the amendment struck down in that case was justified by the state's interests in protecting the associational rights of landlords and employers with moral objections to homosexuality and in "conserving resources to fight discrimination against other groups."  517 U.S. at 635.

The Court found it "impossible to credit" these proffered purposes.  <u>Id.</u> Noting that rational basis inquiry was meant to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law," <u>id.</u> at 633, the Court held that

> [e]ven laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons.  Amendment 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that <u>outrun</u> and <u>belie</u> any legitimate justifications that may be claimed for it.

<u>Id.</u> at 635 (emphasis added).  Because the amendment bore no credible relationship to the state's proffered legitimate justifications, the Court accepted "the inevitable inference that the disadvantage imposed is born of animosity

48

toward the class of persons affected." Id. at 634.  And it concluded that, whatever

else might be said of the amendment, it "offended" the "conventional and

venerable" principle that "a law must bear a rational relationship to a legitimate

governmental purpose." Id. at 635.

In all four cases, the Court concluded that the asserted justifications were

not rationally related to the classification. Thus, the Court inferred that animus

was the motivation behind the legislation and established that such a motivation

could not constitute a legitimate state interest.[13]  As Justice O'Connor noted in

Lawrence, "if these cases have stare decisis effect, Texas' sodomy law would not

pass scrutiny under the Equal Protection Clause, regardless of the type of rational

---

[13] Judge Birch incorrectly claims that I have argued that these cases stand for the proposition that rational-basis review should focus on the actual reasons for enacting a statute.  See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at *6, 8, 14.  On the contrary, I recognize that if Florida's post hoc justifications were able to rationally account for its ban on homosexual adoption, then Florida's law might be constitutional notwithstanding some evidence in the legislative record that the state's actual motivation was animus.  Thus, the suggestion that I have invented some alternative "animus/analysis" theory is a complete distortion of my position.  Id. at *6.  Instead, I merely contend that the Supreme Court's decisions in Eisenstadt, Moreno, Cleburne, and Romer require that we examine Florida's post hoc rationales to determine if there is some conceivable legitimate government interest that can plausibly account for Florida's law.  There is nothing novel about this kind of analysis.  As Judge Birch himself recognizes, in certain circumstances, a court may infer that a statute is motivated by animus or irrational prejudice when the proffered rationales cannot rationally explain the actual operation of the statute.  Id. at *9-11.  Because animus and irrational prejudice are not legitimate governmental purposes, such a statute will fail rational-basis scrutiny.  Id. at *10-12.  I have simply applied these principles to the facts of this case, as I am required to do in faithfully applying Supreme Court precedent.  As I explain in detail below, I do not believe Judge Birch has offered any plausible explanation for Florida's categorical determination that homosexuals are inherently and always unfit to serve as adoptive parents.  I fail to see how any objective observer could think such a law is rational and consistent with the most basic, minimal notions of equal protection under law.

49

basis review that we apply," 123 S. Ct. at 2485. So too does Florida's law fail to survive any form of rational basis review. Here, there is no question that a politically unpopular group is being targeted, that the challenged legislation inhibits personal relationships, and that there is no legitimate rational relationship between Florida's proffered justifications and its sweeping categorical adoption ban against homosexuals.

**B.    Subjected to the Identical Analysis Used in <u>Eisenstadt</u>, <u>Cleburne</u>, <u>Moreno</u>, and <u>Romer</u>, the Florida Ban Would be Unconstitutional.**

Like the justifications for the statutes in the cases discussed above, Florida's proffered justifications for the categorical ban here are false, do not rationally relate to the best interests of children, and are simply pretexts for impermissible animus and prejudice against homosexuals. The panel in <u>Lofton</u> credits the state's assertion that the statutory ban is

> designed to create adoptive homes that resemble the <u>nuclear family</u> as closely as possible. Florida argues that the statute is rationally related to Florida's interest in furthering the best interests of adopted children by placing them in <u>families with married mothers and fathers</u>. Such homes, Florida asserts, provide the <u>stability that marriage affords</u> and the presence of both male and female authority figures, which it considers critical to optimal childhood development and socialization. In particular, Florida emphasizes a <u>vital role that dual-gender parenting plays in shaping sexual and gender identity and in providing heterosexual role modeling</u>. Florida argues that disallowing adoption into homosexual households, which are necessarily motherless or fatherless and <u>lack the stability that comes with</u>

50

marriage, is a rational means of furthering Florida's interest in promoting adoption by marital families.

358 F.3d at 818-19 (emphasis added).

This rhetoric boils down to the argument that Florida prohibits homosexuals from being considered as adoptive parents because it wishes to place children with married couples. It wishes to do so for two alleged reasons: (1) to provide "stability" in the home, which the panel apparently believes can only be provided by married couples representing the "nuclear" family model; and (2) to properly shape heterosexual "sexual and gender identity," which the panel asserts should be accomplished by married couples.

Like the proffered reasons in Eisenstadt, which were "so riddled with exceptions" that the state's asserted goal could not "reasonably be regarded as its aim," 405 U.S. at 449, the state's proffered rational basis for the statute here (providing adopted children with married couples as parents) cannot be legitimately credited because it fails the equal protection requirement that "all persons similarly situated should be treated alike." Cleburne, 473 U.S. at 439. As noted at the beginning of this dissent, it is plainly false that Florida has established a preference for "married mothers and fathers" as adoptive parents. The 1977 statute prohibiting homosexual adoption expresses no preference whatsoever for

51

married couples, expressly permitting an "unmarried adult" to adopt. Fla. Stat. § 63.042(1)(b) (2003). Moreover, the DCF administrative regulations that are inextricably tied to Florida's adoption statutes do not prefer married over single candidates for adoption.[14] In short, the Florida legislature never did, and the Florida executive no longer does, express a preference for married over unmarried couples or singles in the area of adoption. The fact that Florida places children for adoption with single parents directly and explicitly contradicts Florida's post hoc assertion that the ban is justified by the state's wish to place children for adoption only with "families with married mothers and fathers." This contradiction alone is enough to prove that the state's alleged reasons are "illogical to the point of irrationality." Eisenstadt, 405 U.S. at 451.

However, instead of acknowledging this glaring gap between the ban on homosexual adoption and the state's purported justification, as did the Supreme Court in invalidating the statutes in Eisenstadt, Moreno, Cleburne, and Romer, the Lofton panel stretches mightily to construct a hypothetical to bridge this gap. "It

---

[14] Fla. Admin. Code Ann. r. 65C-16.005 (2004). It should also be noted that even under the earlier version of the DCF regulations unmarried couples were only barred from adopting *jointly*. Fla. Admin. Code Ann. r. 65C-16.005 (2002). As single persons, heterosexuals have never been categorically barred from adopting in Florida. The April 2002 revision of the regulations provided that DCF "will accept the application of single persons seeking to adopt a child." This remains true under the current regulations. Defendants and plaintiffs agree that over twenty-five percent of adoptions out of foster care in Florida are by single people, and that in the district covering Miami-Dade County, this figure is over forty percent. R. at 124 (Stipulation at ¶¶ 24-25).

is not irrational," the panel opines, "to think that heterosexual singles have a markedly greater probability of eventually establishing a married household and, thus, providing their adopted children with a stable, dual-gender parenting environment." Lofton, 358 F.3d at 822. The panel's contrived hypothetical offering blatantly ignores not only the absence of any preference in Florida's statute for married couples but also the realities of the adoption process. Evaluations of prospective parents are based on present, not "eventual," status and conditions.[15] Florida does not ask for a commitment of plans to marry someday in the future and permits single adults to adopt without making inquiry into whether they have immediate, or even long-range, marriage plans or prospects. Indeed, that many individuals choose to adopt outside of marriage is an indication that adoption and commitment to a permanent adult relationship are completely separate decisions.[16] Moreover, experience leads one to believe that single heterosexuals who adopt are less likely to marry in the future, not more likely.

---

[15] In a different context, a much more plausible hypothetical clarifies the reality of placement on the basis of existing conditions. If an applicant were unemployed and had no immediate job prospects or other present means of financially supporting a child, no placement agency would even consider permitting an adoption in the hopes that "some day" the adopting parent would be able to obtain employment, even if the applicant were a college graduate or had other job skills. The relevant inquiry has to be the conditions into which the child will be placed now.

[16] That the state endorses adoption by single parents in the same fashion as married couples reflects the fact that the best interests of the child depend upon considerations other than access to a two-parent household. Indeed, in many cases homosexual couples can provide a stable, two-parent household that singles, by definition, cannot.

53

Finally, this speculative hypothesis also fails to take account of "non-practicing homosexuals" who are not likely to marry but can adopt under Florida law.[17]  The Supreme Court found the state's arguments in Eisenstadt to be a futile and transparent move to escape the reach of the Court's decision in Griswold.  405 U.S. at 450.  The hypothetical posited by the Lofton panel demonstrates a comparable and equally transparent attempt to ignore the equal protection cases applicable here.

In addition to its failure to meaningfully distinguish homosexuals from single heterosexuals, the panel never explains why it is rational to believe that homosexuals, as a class, are unable to provide stable homes and appropriate role models for children.  With respect to the first of these arguments, there is absolutely no record evidence to show that homosexuals are incapable of providing the permanent family life sought by Florida.  To the contrary, as the facts in this case suggest, many children throughout the country are lovingly and successfully cared for by homosexuals in their capacity as biological parents, foster parents, or legal guardians.[18]  Furthermore, it is not marriage that guarantees

---

[17] Cox, 627 So. 2d at 1215, held that for purposes of the statute at issue, the term "homosexual" is "limited to applicants who are known to engage in current, voluntary homosexual activity."

[18] Yet another disturbing aspect of Florida's ban is that, while permitting single persons to adopt, this statute could conceivably ban the homosexual partner of a biological parent from adopting the partner's biological child.

a stable, caring environment for children but the character of the individual caregiver.[19] Indeed, given the reality of foster care in Florida, the statute actually operates to impede, rather than promote, the placement of a child into a permanent family. Florida's statute expresses a clear intent "to protect and promote the well-being of persons being adopted . . . and to provide to all children who can benefit by it a permanent family life." Fla. Stat. § 63.022(3) (2003). Yet,

---

[19] The most recent U.S. Census Bureau statistics indicate that about 50% of first marriages for men under age 45 may end in divorce. The figures for the first marriages of women in the same age group range between 44 and 52%. Rose M. Kreider and Jason M. Fields, "Number, Timing, and Duration of Marriages and Divorces: Fall 1996," Current Population Reports (P70-80) at 18. Washington, DC: U.S. Census Bureau, 2001. These statistics are confirmed by the findings of the National Center for Health Statistics, which released a report in 2001 finding that 43% of first marriages end in separation or divorce within fifteen years. Matthew Bramlett & William Mosher, "First Marriage Dissolution, Divorce, and Remarriage: United States," Advance Data from Vital and Health Statistics (2001). As of 2001, Florida ranked with Mississippi as the state with the sixth highest divorce rate in the nation. U.S. Census Bureau, Statistical Abstract of the United States (2003) at 100. This ranking includes the District of Columbia but not California, Colorado, Indiana, and Louisiana, which did not report divorce statistics to the Census Bureau. As Florida Statute § 63.042(1)(b) makes explicit, the fact that two persons are married does not make them fit parents or tell us how or even whether they will fulfill the responsibilities of caring for children. There is nothing selective about the institution of marriage; all kinds of persons who would not be regarded as suitable adoptive parents are admitted to the responsibilities of marriage, and marriage does not insulate spouses or children from the neglect and abuse that occur within it. In its annual national report on child abuse and neglect mandated under the Child Abuse and Prevention and Treatment Act ("CAPTA"), the U.S. Department of Health and Human Resources found that 81% of the perpetrators were parents defined as birth parents, adoptive parents, and stepparents. Similarly, in Florida, the report indicates that 78% of all reported child maltreatment cases were committed by parents. See Admin. for Children & Families, U.S. Dep't of Health & Human Serv., Child Maltreatment 2002: Reports from the States to the National Child Abuse and Neglect Data Systems - National Statistics on Child Abuse and Neglect (2004). In 2002, a total of 121,834 cases of domestic violence were reported to police law enforcement agencies in the state of Florida. Of that number, 26% (31,874) of the victims were spouses while 8% (9,190) of the victims were children. See Fla. Statistical Analysis Ctr., Fla. Dep't of Law Enforcement, Florida Uniform Crime Report (1992-2002).

Florida's foster care system has a backlog of more than 3,400 children in it, far more than the number of married couples eligible to adopt.[20]  Given this backlog, the state's ban on gay adoption does nothing to increase the number of children being adopted, whether by married couples or anyone else.  The state is evidently willing to allow children to live with the potential uncertainties of several foster-care placements rather than enjoy the security and certainty of an adoptive home with one or two caring parents who are also homosexual.[21]

Nor does the panel offer a reason for why it is rational to credit the state's second argument: that homosexuals are incapable of providing good role models. The panel claims that "[heterosexual] children will need education and guidance after puberty concerning relationships with the opposite sex. . . . It is in the best interests of a child if his or her parents can personally relate to the child's problems and assist the child in the difficult transition to heterosexual adulthood."

---

[20] R. at 124 (Stipulation at ¶ 15).

[21] In its August 2001 "Child and Family Services Review Final Assessment," the U.S. Department of Health and Human Services found that Florida failed to meet the national standard for stability of foster care placements (measured in terms of the percentage of children who experience more than two placements during their first twelve months of placement).  The same assessment found that, in over 40% of the cases reviewed, Florida failed to meet its own statutorily specified permanency goals for children in its foster care system.  (Florida law requires that a permanent living situation be sought for each child who has remained in out-of-home care for twelve consecutive months, and that progress towards this permanency goal be reviewed on a biannual basis.) Admin. for Children & Families (Region IV), U.S. Dep't of Health & Human Serv., Child and Family Services Review Final Assessment (2001) at 14-17.

Lofton, 358 F.3d at 822 (quoting Cox, 627 So. 2d at 1220, which predates Lawrence and relies on Bowers). Is the panel suggesting that heterosexual parents are necessary in order to tell children about their own dating experiences after puberty? For anyone who has been a parent, this will no doubt seem a very strange, even faintly comical, claim. There is certainly no evidence that the ability to share one's adolescent dating experiences (or lack thereof) is an important, much less essential, facet of parenting. The difficult transition to adulthood is a common human experience, not an experience unique to human beings of a particular race, gender, or sexual orientation. It is downright silly to argue that parents must have experienced everything that a child will experience in order to guide them. Indeed, that will generally not be the case. For example, immigrant parents help their children adjust to a world and culture they have not known. It cannot be suggested that such individuals are unfit to parent any more than it could be suggested that a mother is unfit to parent a son or that a white person is unfit to parent an African-American child.[22] Furthermore, the panel's argument completely neglects to consider the situation of gay children of heterosexual parents. Children simply need parents who will love and support them.

---

[22] Nor, for example, could anyone responsibly suggest that priests must be married in order to provide marriage counseling, or that psychiatrists must have suffered every ill they treat.

In addition to this contrived argument about teenage dating advice, the panel suggests that placing children with homosexual parents may make it more likely that children will become homosexual, referring cryptically to the "vital role that dual-gender parenting plays in shaping sexual and gender identity and in providing heterosexual role modeling." Lofton, 358 F.3d at 818 (emphasis added). In our democracy, however, it is not the province of the State, even if it were able to do so, to dictate or even attempt to influence how its citizens should develop their sexual and gender identities. This approach views homosexuality in and of itself as a social harm that must be discouraged, and so demeans the dignity of homosexuals, something that Lawrence specifically proscribes. Lawrence, 123 S. Ct. at 2482, 2484 (finding that gays and lesbians are "entitled to respect for their private lives.").

Finally, the panel also intimates in dicta that Florida has a legitimate interest in defending public morality by expressing disapproval of homosexuality. Lofton, 358 F.3d at 819 n.17. But moral disapproval of disfavored groups "is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause." Lawrence, 123 S.Ct. at 2486 (O'Connor, J., concurring). Moreno established that "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a

58

politically unpopular group cannot constitute a legitimate government interest." 413 U.S. at 534. As the <u>Lawrence</u> Court made clear, "[o]ur obligation is to define the liberty of all, not to mandate our own moral code." 123 S. Ct. at 2480 (quoting <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>, 505 U.S. 833, 850 (1992)).

Nor may the state hide behind a suggestion that it is attempting to protect children from disapproval at large in society. Florida courts have specifically rejected moral disapprobation of homosexuality as a justification for granting custody of a child to one or another biological parent. <u>See</u> <u>Maradie v. Maradie</u>, 680 So. 2d 538 (Fla. Dist. Ct. App. 1996) (holding that a lower court's finding as to the effect of a homosexual environment on a child is not a proper subject of judicial notice, and that it requires reversal and remand for a new custody determination); <u>Jacoby v. Jacoby</u>, 763 So. 2d 410 (Fla. Dist. Ct. App. 2000) (citing <u>Palmore v. Sidoti</u>, 466 U.S. 429, 433 (1984), and holding that a lower court's reliance on perceived biases against homosexuality is an improper basis for a residential custody determination).

Ultimately, the breadth of the categorical adoption ban "outrun[s] and belie[s]" the state's asserted justifications. <u>Romer</u>, 517 U.S. at 635. As <u>Cleburne</u> discounted the state's asserted reason of protecting the public from fraud because

the state had adequate anti-fraud provisions with strict penalties, Florida's rationale should likewise be discounted, given that Florida has explicitly tailored provisions to protect children placed in adoptive homes. Florida Statute § 63.092(3) (2003) requires a preliminary and thorough home study of prospective adoptive parents and the state uses its full power to screen all applicants and bar adoption by anyone not deemed to be a fit parent. The adoption statute accords everyone other than homosexuals the benefit of an individualized consideration that is directed toward the best interests of the child. Child abusers, terrorists, drug dealers, rapists and murderers are not categorically barred by the adoption statute from consideration for adoptive parenthood in Florida.[23] On the other hand, individuals who take children into their care, including unwanted children, such as those who are HIV-positive, and who have raised them with loving care for years are categorically barred from adopting if they happen to be homosexual. In the context of adoption, this disparity of treatment on the face of the statute amounts to the purest form of irrationality.

---

[23] The statute's preliminary home study requirement includes a check of the DCF central abuse registry and statewide criminal records. Fla. Stat. § 63.092(3)(b) (2003). DCF administrative regulations and Florida's labor code (not the Florida adoption statute) bar those convicted of crimes against children and certain crimes of violence from adopting. But these same provisions permit persons with a felony conviction for physical assault, battery, or a drug-related offense to adopt if the offense was committed more than five years before. Fla. Admin. Code Ann. r. 65C-16.005(9)(a)(3) (2003) (referencing Fla. Stat. § 435.045(1)(a)(1) & (2) (2001)).

Just as troubling, even where a foster relationship is comparable to the most stable and caring of biological parent-child relationships, the state may remove a child from that relationship simply because the parent is a homosexual.[24]  In light of these considerations, it is no exaggeration to say that the best interests of the child not only fail to justify or support the ban on homosexual adoption, but that those interests are actually subordinated to the state's evident need to discriminate on the basis of sexual orientation.

The Equal Protection Clause does not permit a classification of persons undertaken for its own sake.  "[C]lass legislation . . . [is] obnoxious to the prohibitions of the Fourteenth Amendment. . . ."  Civil Rights Cases, 3 S.Ct. 18, 30 (1883).  When there is no reason to believe that the disadvantaged class is different, in relevant respects, from similarly situated classes, the Supreme Court has held that irrational prejudice can be inferred as the basis for a classification. Cleburne, 473 U.S. at 449-50.  Here, irrational prejudice can be inferred as the basis for this classification because there is no difference in relevant respects between single heterosexual persons and single homosexual persons with reference to the state's purported justification for the ban in the statute.  Moreover,

---

[24] In response to the ACLU's June 2001 request for a guarantee that Doe would not be taken away from Lofton, the DCF responded that it "is left with no legal alternative but to make appropriate efforts to place [Doe] for adoption."  Appellees' Br. at 11 (quoting R4-132, Ex. G).

when all the proffered rationales for a law are clearly and manifestly implausible, a reviewing court may infer that animus is the only explicable basis. <u>Romer</u>, 517 U.S. at 632, 635. Since Florida's rationale is not plausible given that single persons may adopt, the inference is obvious that Florida's decision to single out homosexuals is based solely on anti-gay animus. Unsurprisingly, animus is just what the legislative history of Florida's ban confirms.

### C. Legislative History

The Florida statute was enacted after an organized and relentless anti-homosexual campaign led by Anita Bryant, a pop singer who sought to repeal a January 1977 ordinance of the Dade County Metropolitan Commission prohibiting discrimination against homosexuals in the areas of housing, public accommodations, and employment. Bryant organized a drive that collected the 10,000 signatures needed to force a public referendum on the ordinance.[25] In the course of her campaign, which the Miami Herald described as creating a "witch-hunting hysteria more appropriate to the 17th century than the 20th,"[26] Bryant

---

[25] <u>See</u> <u>generally</u> "Battle over Gay Rights," <u>Newsweek</u>, June 6, 1977.

[26] Bill Paterson, "Fear Intense on Both Sides of Gay Rights Vote Tuesday," Wash. Post, June 6, 1977.

referred to homosexuals as "human garbage."[27]  She also promoted the insidious

myth that schoolchildren were vulnerable to molestation at the hands of

homosexual schoolteachers who would rely on the ordinance to avoid being

dismissed from their positions.[28]

In response to Bryant's efforts, Senator Curtis Peterson introduced

legislation in the Florida Senate banning both adoptions by and marriage between

homosexuals.  The legislative history reveals the very close and utterly transparent

connection between Bryant's campaign and the Peterson bills.  At the May 3, 1977

hearings of the Senate Judiciary Civil Committee, for example, Senator Peterson

observed that "it is a possible problem, constantly in the news."[29]  Senator George

Firestone commented that "this [gay rights controversy] has totally polarized [my]

community unnecessarily."[30]  And Senator Don Chamberlin explicitly tied the

Bryant campaign to the proposed ban on homosexual adoption, arguing that the

latter would never have arisen without the ruckus over the Dade County

---

[27] "Battle over Gay Rights," Newsweek, June 6, 1977; Laura Benkov, Reinventing the Family: The Emerging Story of Lesbian and Gay Parents 83 (1994).

[28] "Battle over Gay Rights," Newsweek, June 6, 1977.

[29] Tape recording of the Florida Senate Judiciary Civil Committee proceedings, May 3, 1977 (copy of original in the Florida State Archives).

[30] Id.

antidiscrimination ordinance.[31]  The impetus for Florida's adoption ban exactly parallels the impetus for the state constitutional amendment struck down in Romer.  See Romer, 517 U.S. at 623-24 ("The impetus for the amendment and the contentious campaign that preceded its adoption came in large part from [the campaigns against antidiscrimination] ordinances that had been passed in various Colorado municipalities."); Moreno, 413 U.S. at 534 (legislative history indicative of purpose to prevent "hippies" and "hippie communes" from participating in food stamp program).

The Florida legislature's intention to stigmatize and demean homosexuals is further confirmed by the passage, on May 30, 1977, of a House amendment that allowed for public disclosure of the reasons for a denial of an application for adoption.  The explicit purpose of this amendment was to protect non-homosexual prospective parents whose applications were denied for reasons other than sexual orientation from the stigma of being thought to be homosexual.[32]  The Senate provided added coverage against stigmatization for non-homosexual applicants

---

[31] Id.; see also Tape recording of the Florida House of Representatives Judiciary Committee proceedings, May 19, 1977 (copy of original in the Florida State Archives) (representative stating that "the majority of the committee supports Ms. Bryant and her move to do what she is doing.").

[32] Tape recording of the Florida House of Representatives proceedings, May 30, 1977 (copy of original in the Florida State Archives).

with its May 31 amendment requiring courts, when dismissing a petition for adoption, to state with specificity the reasons for doing so.[33]

Throughout all of these proceedings, it could hardly be said that there was any discussion of the "best interests of the child" standard. The only legislator who bothered to inject the concept was Senator Chamberlin, who tried to block the bill, noting that there was no incompatibility at all between homosexuals and the best interests of children.[34] Another senator simply stated that "we have a responsibility to provide children with a wholesome atmosphere."[35]

As the House and Senate gave their final approval to the Peterson bills on May 31, Senator Peterson stated that his bills were a message to homosexuals that "[w]e're really tired of you. We wish you would go back into the closet."[36] On June 8, 1977, exactly one day after Dade County voters repealed the

---

[33] Tape recording of the Florida Senate proceedings, May 31, 1977 (copy of original in the Florida State Archives). This Senate amendment is now codified as Fla. Stat. § 63.142(3)(b) (2003).

[34] Tape recording of the Florida Senate Judiciary Civil Committee proceedings, May 3, 1977.

[35] Tape recording of the Florida Senate proceedings, May 11, 1977 (copy of original in the Florida State Archives).

[36] "Gay Bills Pass Both Chambers," Florida Times Union, June 1, 1977. Senator Peterson is also quoted in this UPI report as stating that "[t]he problem in Florida is that homosexuals are surfacing to such an extent that they're beginning to aggravate the ordinary folks, who have a few rights of their own."

antidiscrimination ordinance,[37] the Governor of Florida signed the Peterson bills

into law, in what can only be seen as a deliberate acknowledgment of the

orchestration between Bryant's campaign and the legislature's actions.[38]  In short,

the legislative history shows that anti-gay animus was the major factor – indeed

the sole factor – behind the law's promulgation, thereby confirming that the

standard of review in this case is controlled by Eisenstadt, Cleburne, Romer, and

Moreno.

Whereas the Texas sodomy statute struck down in Lawrence treated

homosexuals as criminals, Florida's ban on gay adoption treats criminals with

more dignity than homosexuals.  Nothing more clearly raises the "inevitable

inference that the disadvantage imposed is born of animosity toward the class of

persons affected," Romer, 517 U.S. at 634, than this disparity of treatment.

## II. SUBSTANTIVE DUE PROCESS

Although I believe that this case can be resolved solely on equal protection

grounds, without considering Lawrence, I address the independent basis of

---

[37] The antidiscrimination ordinance, however, has since been repassed by the Miami-Dade County Commission.  See Miami-Dade County Code of Ord., Ch. 11A, Art. 1(1) (1997-98) ("It is hereby declared to be the policy of Dade County . . . to eliminate and prevent discrimination in employment, family leave, public accommodations, credit and financing practices, and housing accommodations because of . . . sexual orientation.").

[38] Assoc. Press, June 8, 1977.

substantive due process because <u>Lofton</u> incorrectly concludes that <u>Lawrence</u> did not recognize a fundamental right to or liberty interest in sexual privacy. As I explain below, <u>Lawrence</u> held that consenting adults have a right under the Due Process Clause to engage in private sexual conduct, including homosexual conduct. Because Florida's law punishes the exercise of this right by denying all active homosexuals the ability to be considered as adoptive parents, we are required to subject Florida's law to heightened scrutiny – not the cursory, attempted rational-basis analysis the panel employs. In addition to its failure to apply heightened scrutiny, the panel makes further errors of law in attempting to evade the application of <u>Lawrence</u>. It makes erroneous statements about the proper use of history and tradition in a substantive due process analysis, and mistakenly claims that <u>Lawrence</u> does not apply here because adoption is a privilege and not a right, and because Florida's statute is a civil rather than criminal law. These reasons are not only unsupported by, but are directly contrary to, Supreme Court precedent.

A. **<u>Lawrence</u> Reaffirmed a Fundamental Right or Liberty Interest to Engage in Private Intimate Sexual Conduct.**

The doctrine of substantive due process requires, first, that every law must address in a relevant way only a legitimate governmental purpose.[39]  In other words, no law may be arbitrary and capricious but rather must address a permissible state interest in a way that is rationally related to that interest.  As a consequence, any law challenged as violating a fundamental right or liberty interest must survive rational-basis review.

However, the Supreme Court has found that some decisions are so fundamental and central to human liberty that they are protected as part of a right to privacy under the Due Process Clause, and that the government may constitutionally restrict these decisions only if it has more than an ordinary run-of-

---

[39] Judge Birch is, thus, mistaken that I view substantive due process as always synonymous with fundamental-rights analysis.  See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at *25.  I agree that rational-basis review is also part of the doctrine of substantive due process.  The source of my disagreement with Judge Birch is based on his attempt to artificially downgrade the Lawrence decision to a rational-basis holding, which, as I explain infra, fails to provides a coherent and plausible interpretation of the entire opinion.

the-mill governmental purpose.[40]  Included within this right to privacy is the

ability to make decisions about private sexual matters.[41]

In invalidating the sodomy statute at issue in <u>Lawrence</u>, the Court

reaffirmed this right of sexual privacy, finding that private homosexual conduct is

likewise encompassed within it.[42]  The Court stated that the Due Process Clause

gives homosexuals "the full right to engage in [private sexual] conduct without

intervention of the government."  <u>Lawrence</u>, 123 S. Ct. at 2484.  There can be no

doubt that the Court's conclusion here is a binding holding.  From the outset of its

opinion, the Court stated that it had granted certiorari specifically to consider

"[w]hether Petitioners' criminal convictions for <u>adult consensual sexual intimacy</u>

---

[40] The Supreme Court has explained that this right includes the ability of adults to make decisions relating to marriage, <u>Loving v. Virginia</u>, 388 U.S. 1, 12 (1967); family relationships, <u>Prince v. Massachusetts</u>, 321 U.S. 158, 165-66 (1944); procreation, <u>Skinner v. Oklahoma</u>, 316 U.S. 535, 541-42 (1942); contraception, <u>Griswold</u>, 381 U.S. at 485-86 and <u>Eisenstadt</u>, 405 U.S. at 453-55; child rearing and education, <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 534-35 (1925) and <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399-400 (1923); and abortion, <u>Roe v. Wade</u>, 410 U.S. 113, 153 (1973).

[41] <u>See</u>, e.g., <u>Carey v. Population Services Int'l</u>, 431 U.S. 678, 685 (1977) and <u>Griswold</u>, 381 U.S. at 485-86 (right to use contraception); <u>Casey</u>, 505 U.S. at 869 (right to seek out an abortion).

[42] From its opening paragraph, the Court emphasized that

> [l]iberty protects the person from unwarranted government intrusions into a dwelling or other private places.  In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence . . . . The instant case involves liberty of the person both in its spatial and more transcendent dimensions.

<u>Lawrence</u>, 123 S. Ct. at 2475.

in the home violate their <u>vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment</u>?" <u>Id.</u> at 2476 (internal quotation marks and citation omitted) (emphasis added). While the Court also granted certiorari to address whether Texas's sodomy statute violated the Equal Protection Clause,[43] the Court explicitly decided to rest its holding on a substantive due process analysis because it found that if a sodomy law "remain[ed] unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons." <u>Id.</u> at 2482.[44] Accordingly, the Court wrote that the "case should be resolved by determining whether the petitioners were free as adults to engage in the private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment." <u>Id.</u> at 2476.

In resolving this issue, the Court retraced its substantive due process jurisprudence by discussing the fundamental rights cases of <u>Griswold</u>,

---

[43] Unlike the sodomy statute at issue in <u>Lawrence</u>, which only applied to homosexual conduct, the Georgia statute in <u>Bowers</u> criminalized acts of sodomy engaged in by both heterosexuals and homosexuals. <u>See</u> <u>Bowers v. Hardwick</u>, 478 U.S. 186, 188 n.1 (1986). The <u>Lawrence</u> Court indicated that the sodomy statute before it could have been invalidated using an equal protection analysis. 123 S. Ct. at 2482. Indeed, this was the conclusion of Justice O'Connor in her concurrence. <u>Id.</u> at 2484-88 (O'Connor, J., concurring).

[44] The <u>Lawrence</u> majority went on to state that "[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." 123 S. Ct. at 2482.

70

Eisenstadt,[45] Roe, and Carey and emphasized the breadth of their holdings as involving private decisions regarding intimate physical relationships. Id. at 2476-77. Beginning with Griswold, the Lawrence Court found that its prior decisions confirmed "that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person" and "that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship." Id. at 2477 (summarizing Griswold, Eisenstadt, Roe, and Carey).

Because of the existence of this right to make private decisions regarding sexual conduct, the Lawrence Court was compelled to overrule the anomaly of Bowers, which had failed to acknowledge this right in permitting Georgia to criminalize sodomy. See Bowers, 478 U.S. at 194-96. Lawrence found that at the time of Bowers the Court's prior holdings had already made "abundantly clear" that individuals have a right to make decisions "'concerning the intimacies of their physical relationship[s], even when not intended to produce offspring.'" Lawrence, 123 S. Ct. at 2483 (quoting Bowers, 478 U.S. at 216 (Stevens, J.,

---

[45] Although Eisenstadt was decided on equal protection grounds, Lawrence noted that Eisenstadt "went on to state the fundamental proposition that the law impaired the exercise of . . . personal rights." 123 S. Ct. at 2477. Further, while Lawrence cited Romer v. Evans, 517 U.S. 620 (1996), as an example of how Bowers had been cast into doubt, the Court immediately declined to decide the case under Romer's equal protection rationale, instead insisting that the decision be resolved on substantive due process grounds. Id. at 2482.

71

dissenting)).[46] On this basis, the Court concluded that "Bowers was not correct

when it was decided, and it is not correct today." Lawrence, 123 S. Ct. at 2484.[47]

---

[46] In overruling Bowers, Lawrence explained that

> our laws and tradition afford constitutional protection to personal decisions relating
> to marriage, procreation, contraception, family relationships, child rearing, and
> education. . . . 'These matters, involving the most intimate and personal choices a
> person may make in a lifetime, choices central to personal dignity and autonomy, are
> central to the liberty protected by the Fourteenth Amendment. At the heart of liberty
> is the right to define one's own concept of existence, of meaning, of the universe, and
> of the mystery of human life. Beliefs about these matters could not define the
> attributes of personhood were they formed under compulsion of the State.'

Id. at 2481 (quoting Casey, 505 U.S. at 851). The Court unequivocally stated that "[p]ersons in a
homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.
The decision in Bowers would deny them this right." Id. at 2482.

[47] Given the Lawrence Court's statement in 2003, I fail to understand Judge Birch's reliance on
a footnote from the Supreme Court's 1977 decision in Carey, where the Court indicated in dicta that
it had not "definitively answered" the extent to which the Due Process Clause protects the private
sexual conduct of consenting adults. Special Concurrence by Judge Birch to Denial of Rehearing
En Banc at *15 (citing Carey, 431 U.S. at 688 n.5). Obviously, Carey does not resolve in any way
the meaning of a case that comes twenty-six years later. Nor does it prevent Lawrence from
answering the very question posed in Carey's footnote. As I discuss extensively in this dissent,
Lawrence does precisely this in affirming the right of consenting adults to make private sexual
decisions. As I also explain, this could not have been a new right. Carey's footnote notwithstanding,
the Lawrence Court determined that its pre-Bowers decisions, properly understood from its later
vantage point, had already recognized a right to sexual privacy. This is the only way to make sense
of the Lawrence Court's statements that Bowers was "not correct when it was decided," and that its
decisions before Bowers had already made "abundantly clear" that adults have a right to make
decisions "concerning the intimacies of their physical relationship[s]." Lawrence, 123 S. Ct. at
2483-84 (internal quotation marks and citation omitted).

In overruling <u>Bowers</u>, <u>Lawrence</u> found that <u>Bowers</u> "misapprehended the claim of liberty there presented" when it framed the issue before it as whether the Constitution protects "a fundamental right to engage in consensual sodomy":

> To say that the issue in <u>Bowers</u> was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. <u>The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home.</u>

<u>Lawrence</u>, 123 S. Ct. at 2478 (emphasis added). Just as marriage involves much more than simply the right to have sexual intercourse, the right to participate in a homosexual relationship extends far beyond the ability to engage in homosexual sodomy. <u>Bowers</u> was therefore wrong to have focused on a particular sexual act instead of upon the right to sexual privacy which encompasses acts of adult consensual sexual intimacy.

<u>Lawrence</u> indicated that the question that <u>Bowers</u> should have asked is whether adults have a right to engage in "private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment." <u>Id.</u> at 2476. In answering this question, <u>Lawrence</u> expressly adopted the reasoning of Justice Stevens' dissent in <u>Bowers</u>:

> [I]ndividual decisions by married persons, <u>concerning the intimacies of their physical relationship</u>, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.

<u>Id.</u> at 2483 (quoting <u>Bowers</u>, 478 U.S. at 216 (Stevens, J., dissenting)) (emphasis added) (internal quotation marks omitted). Because the private conduct at issue in <u>Lawrence</u> also concerned the "intimacies" of a "physical relationship," the Court held that the petitioners have a right to engage in private sexual conduct without government interference. <u>Id.</u> at 2484.

The <u>Lawrence</u> Court's answer to its question of whether adults have a right to engage in private sexual conduct – the question it granted certiorari to answer and which it found was necessary to resolve the case – is binding precedent and should control the outcome here. While the <u>Lofton</u> panel concedes that "substantive due process does not permit a state to impose a criminal prohibition on private consensual homosexual conduct," <u>Lofton</u>, 358 F.3d at 815, it fails to consider the ramifications of such a holding. Without defining what other kind of right it could be, <u>Lofton</u> maintains that "it is a strained and ultimately incorrect reading of <u>Lawrence</u> to interpret it to announce a new fundamental right." <u>Id.</u> at 817. Indeed, <u>Lawrence</u> did not establish a <u>new</u> fundamental right. Rather, given the Court's statement that <u>Bowers</u> was not correct when it was decided, the

74

Lawrence Court reiterated the longstanding right of consenting adults to engage in private sexual conduct.

**B. Lofton's Arguments for Why Lawrence is a Rational Basis Case are Unsupported by any Supreme Court Precedents.**

In addition to its insistence that Lawrence did not announce a "new" right to sexual privacy, the panel offers four arguments for its skewed reading of Lawrence as a pure rational-basis decision. First, it claims that Lawrence did not "locate this right [to sexual privacy] directly in the Constitution." Id. at 816. Second, it argues that Lawrence failed to provide the "careful description" of the asserted right required by Glucksberg. Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)) (internal quotation marks omitted). Third, the panel claims that Lawrence failed to identify a history and tradition of affirmative protection of the right to engage in homosexual conduct. Id. at 816 n.15. Finally, the panel argues that Lawrence could not have recognized a fundamental right or liberty interest entitled to heightened scrutiny because of a single sentence in the opinion indicating that the Texas sodomy statute furthered no legitimate state interest. Id. at 817.

Regarding the panel's first argument, as noted earlier, the Lawrence Court stated that the petitioners' "right to liberty under the Due Process Clause gives

them the full right to engage in their [private sexual] conduct without intervention of the government." 123 S. Ct. at 2484 (emphasis added). The Court could not have been more clear that the petitioners' right to engage in private sexual conduct was located in the Due Process Clause. Thus, the panel's argument that Lawrence did not "locate this right directly in the Constitution" is meritless.

The panel's second argument that Lawrence did not provide the "careful description" of the right required by Glucksberg is also untenable given that the Lawrence Court was at pains to describe how Bowers had misframed the question in that case in terms of whether there was a fundamental right to engage in consensual homosexual sodomy. As indicated above, Lawrence explained that the narrow framing of the question in Bowers "demean[ed] the claim" set forth and "disclose[d] the Court's own failure to appreciate the extent of the liberty at stake" in that case. Id. at 2478 (Bowers "misapprehended the claim of liberty there presented to it"). The Lawrence Court explained that "[t]he laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home." Id. (emphasis added). Thus, Lawrence demonstrates that the "careful description" of a liberty interest

76

required by <u>Glucksberg</u> will not necessarily be synonymous with framing the liberty interest in the most narrow fashion possible. The panel has ignored this important clarification of the <u>Glucksberg</u> analysis required by the Court's subsequent decision in <u>Lawrence</u>. Inexplicably, given its purported interest in a "careful description" of the asserted right, the panel also fails to recognize that part of <u>Lawrence</u> in which the Court clearly states what the right at issue is and is not about for purposes of guiding future courts:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.

<u>Id.</u> at 2484.[48]

Third, the panel further ignores how <u>Lawrence</u> clarifies <u>Glucksberg</u>'s treatment of the role of history and tradition in identifying a fundamental right or liberty interest. The panel misreads <u>Glucksberg</u> to say that the only relevant historical inquiry is whether there has been a tradition of laws affirmatively

---

[48] Judge Birch makes inconsistent use of this passage. On the one hand, he uses it to argue that <u>Lawrence</u> cannot possibly extend to the facts of the instant case – an argument that, for reasons described in Part II.C below, is untenable. <u>See</u> Special Concurrence by Judge Birch to Denial of Rehearing <u>En Banc</u> at *23. On the other hand, he overlooks this passage when it comes to arguing that <u>Lawrence</u> did not provide a careful description of the scope of the right at issue. <u>Id.</u> at *18.

77

protecting the conduct at issue. Lofton, 358 F.3d at 816 n.15. The panel then argues that while Lawrence "devote[d] considerable attention to history and tradition," it did so only to demonstrate that there had not been a "history of enacting, and regularly enforcing, laws specifically directed at private homosexual conduct." Id. Apparently in the panel's view, this was a superfluous inquiry, devoid of legal meaning. According to the panel, the Supreme Court should have asked "whether there has been a deeply rooted tradition and history of *protecting* the right to homosexual sodomy or the right to private sexual intimacy." Id.

The panel's belief that a history of state non-interference in the private sexual lives of homosexual adults cannot, as a matter of law, serve as the basis for recognizing a right to sexual privacy is entirely unsupported by any Supreme Court case. The panel has simply made up a new constitutional requirement that there must be a history of affirmative legislative protection before a right can be judicially protected under the Due Process Clause. Such a requirement ignores not only Lawrence, but an entire body of Supreme Court jurisprudence. Had the Supreme Court required affirmative governmental protection of an asserted liberty interest, all of the Court's privacy cases would have been decided differently.[49]

---

[49] For instance, there was no lengthy tradition of protecting abortion and the use of contraceptives, yet both were found to be protected by a right to privacy under the Due Processs Clause. In Roe, the Court's historical analysis of Anglo-American statutory and common law served

78

Equally significantly, the panel fails to heed the <u>Lawrence</u> Court's instruction that "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." 123 S. Ct. at 2480 (internal quotation marks and citation omitted). As <u>Lawrence</u> stated:

> [W]e think that our laws and traditions in the past half century are of most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex.

<u>Id.</u> Thus, <u>Lawrence</u> elucidates the <u>Glucksberg</u> discussion of the proper use of history and tradition in more than one sense. In addition to clarifying that history and tradition do not themselves resolve the due process inquiry, <u>Lawrence</u> establishes that recent trends and practices are as important as more distant ones in defining the existence and scope of a liberty interest. The panel's discussion of history and tradition is outdated in both of these respects.

Fourth and finally, the panel insists that, no matter how hard <u>Lawrence</u> tries, it cannot have involved a liberty interest that requires heightened scrutiny because of a single reference to the phrase "legitimate state interest" towards the end of the <u>Lawrence</u> opinion. <u>Lofton</u>, 358 F.3d at 817 (quoting <u>Lawrence</u>, 123 S. Ct. at

---

to provide evidence of the relatively recent (late nineteenth-century) vintage of state restrictions on abortion, not to demonstrate a tradition of affirmative protection of the right to an abortion. 410 U.S. at 132-41. Despite the lack of a history of protecting the right to abortion, the <u>Roe</u> Court nevertheless held that the "right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." <u>Id.</u> at 153.

79

2484) (internal quotation marks omitted).  The sentence in question stated that "[t]he Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."  Lawrence, 123 S. Ct. at 2484.  The panel misconstrues even this solitary fragment of the Lawrence opinion.  The mere presence of the phrase "legitimate state interest" does not mean that heightened scrutiny is not applicable, as can be seen by its use in conjunction with the application of heightened scrutiny.  As the Supreme Court has explained, "[w]here certain fundamental rights are involved, the Court has held that regulation limiting these rights may be justified only by a compelling state interest, and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake."  Roe, 410 U.S. at 155 (emphasis added) (internal citations and quotation marks omitted).[50]  Once the Lawrence Court found that the Texas sodomy statute completely proscribed the petitioners' substantive right under the Due Process Clause, and that the law lacked any legitimate purpose, its inquiry was at an end.  Heightened scrutiny requires a compelling state interest.  The Lawrence Court clearly found that there was not

---

[50] As indicated by Justice Souter in Glucksberg, this heightened protection applies regardless of whether the protected right is expressly labeled as "fundamental."  521 U.S. at 768 n.10 (Souter, J., concurring) ("Our cases have used various terms to refer to fundamental liberty interests," including "basic liberty," "constitutionally protected liberty interest," and "right") (internal citations and quotation marks omitted); Casey, 505 U.S. at 848 (requiring heightened scrutiny of burdens on right to abortion without labeling right as "fundamental").

even a conceivable legitimate state interest that could have sustained the Texas law.

The only way to avoid the conclusion that <u>Lawrence</u> recognized a fundamental right or liberty interest that requires heightened scrutiny is to deliberately refuse to give meaning to the overwhelming bulk of the words, phrases, sentences, and paragraphs used in <u>Lawrence</u>. Under the panel's view, <u>Lawrence</u> is a one-sentence opinion with pages and pages of irrelevant <u>dicta</u>.[51] I submit that it is the panel in <u>Lofton</u> that constructs a "strained and ultimately incorrect reading of <u>Lawrence</u>."

### C. Florida's Adoption Ban is Subject to Heightened Scrutiny Because It Significantly Burdens the Right Identified in <u>Lawrence</u>.

Every precedent teaches that when the government directly burdens a fundamental right or liberty interest of the nature affirmed in <u>Lawrence</u>, heightened scrutiny applies. <u>See</u>, <u>e.g.</u>, <u>Roe</u>, 410 U.S. at 155; <u>Zablocki v. Redhail</u>, 434 U.S. 374, 387-88 (1978) (heightened scrutiny applies to direct and substantial burdens on due process right).[52] This heightened scrutiny requires that legislation

---

[51] <u>See also</u> Special Concurrence by Judge Birch to Denial of Rehearing <u>En Banc</u> at *19 (arguing that the <u>Lawrence</u> Court "disposes of the case in a single sentence").

[52] <u>See also</u> <u>McKinney v. Pate</u>, 20 F.3d 1550, 1556 (11th Cir. 1994) (noting that when a "right merits substantive due process protection" it is protected against government actions regardless of the fairness of the procedures used).

81

be "narrowly drawn" to achieve a "compelling state interest."  Roe, 410 U.S. at

155.[53]

The panel argues essentially that, even if Lawrence affirmed a fundamental

right or liberty interest, heightened scrutiny is not appropriate here, first, because

adoption is a privilege and not a right under state law and, second, because

Florida's ban is the product of a civil rather than a criminal law.[54]

With respect to the panel's first argument, the Supreme Court long ago

rejected the rights/privileges distinction.  See, e.g., Shapiro v. Thompson, 394 U.S.

618, 627 n.6, 638 (1969) (invalidating law that conditioned receipt of welfare

benefits, a statutory privilege, on one-year residency requirement as an

unconstitutional burden on right to interstate travel, and noting that "[t]his

constitutional challenge cannot be answered by the argument that public assistance

benefits are a 'privilege' and not a 'right.'"), overruled in part on other grounds by

---

[53] The only sexual privacy case where the Court did not use this language was Casey, where it analyzed civil burdens on a woman's right to abortion, not an outright criminal ban.  The Court found that a state regulation that had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" would place an "undue burden" on the right to abortion and therefore be unconstitutional.  Casey, 505 U.S. at 869.

[54] Lofton, 358 F.3d at 809 ("Appellants' challenge cannot be viewed apart from the context in which it arises. Under Florida law, adoption is not a right; it is a statutory privilege. . . [A]doption law is unlike criminal law, for example, where the paramount substantive concern is not intruding on individuals' liberty interests.") (internal quotation marks and citation omitted).

Edelman v. Jordan, 415 U.S. 651 (1974).[55]  Therefore, contrary to the panel's

suggestions, the refusal to extend a government benefit or privilege on non-

discriminatory terms may indeed unconstitutionally burden the exercise of a

fundamental right or liberty interest.

The panel's second argument is also mistaken.  See Lofton, 358 F.3d at 817

(distinguishing Lawrence because "[t]he relevant state action [here] is not criminal

prohibition, but grant of a statutory privilege").  The need to closely scrutinize

Florida's justifications for burdening this right is not diminished because the

burden in this case is the product of a civil statute, rather than a criminal law.

Once a fundamental right or liberty interest has been established, the Supreme

Court has stated that heightened scrutiny applies not only when a state punishes its

---

[55] See also Graham v. Richardson, 403 U.S. 365, 374 (1971) ("[T]his Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'"); Goldberg v. Kelly, 397 U.S. 254, 262 (1970) ("The constitutional challenge cannot be answered by an argument that public assistance benefits are a 'privilege' and not a 'right.'"); Sherbert v. Verner, 374 U.S. 398, 404 (1963) ("[C]onstruction of the statute [cannot] be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.'  It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); and Speiser v. Randall, 357 U.S. 513, 518 (1958) ("[A]ppellees are plainly mistaken in their argument that, because a tax exemption is a 'privilege' or 'bounty,' its denial may not infringe speech.").  See also Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972) ("[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights."); and Jones v. State Bd. of Educ. for State of Tennessee, 397 U.S. 31, 34 (1970) ("[I]t is far too late to suggest that since attendance at a state university is a 'privilege,' not a 'right,' there are no constitutional barriers to summary withdrawal of the 'privilege.").

exercise by means of a criminal statute, but also when a civil law directly and substantially burdens that protected right.

For example, the Court in Zablocki applied heightened scrutiny in striking down a civil law that prevented individuals who had not made child support payments from receiving a marriage license. 434 U.S. at 388-91. The Court found that the government was unable to show that the law was justified by "sufficiently important state interests" or that it was "closely tailored to effectuate only those interests." Id. at 388. The Court explained that heightened scrutiny was appropriate because the law had "directly and substantially" burdened the right of poor people to marry. Id. at 387.

Similarly, in Shapiro, the Court struck down the civil laws of various jurisdictions which required that residents live within the jurisdiction for a year before receiving welfare benefits. 394 U.S. at 622-23, 642. Even though the laws involved the receipt of a government benefit (welfare payments) rather than a right, the Court expressly rejected the application of rational-basis review. Id. at 627 n.6 (noting that "[t]his constitutional challenge cannot be answered by the argument that public assistance benefits are a 'privilege' and not a 'right.'") (emphasis added). Instead, because the law "penalized" the fundamental right to

84

interstate travel, the Court asked whether the law was "necessary" to achieve a "compelling governmental interest." Id. at 634.

Together, Zablocki and Shapiro stand for the proposition that a court must analyze a civil law under heightened scrutiny when it either penalizes or severely burdens the exercise of a fundamental right. I submit that if heightened scrutiny was required given the nature of the civil burdens in Zablocki and Shapiro, then such scrutiny must, a fortiori, apply in this case. After all, in Zablocki, a person could marry after making his or her delinquent child support payment. And in Shapiro, a resident would be eligible to receive welfare payments (a government benefit like the ability to adopt) after living in the relevant jurisdiction for a year. But a person exercising his or her Lawrence right in Florida may never adopt. The categorical nature of this ban, which burdens the right to form intimate relationships only when it is exercised by homosexuals, requires the same close analysis that the Court gave to the laws analyzed in Zablocki and Shapiro and warrants the very same result.[56] None of the three cases newly cited by Judge

---

[56] In Zablocki and Shapiro, the Court applied heightened scrutiny using an equal protection analysis. This made sense given that the government had burdened the right of poor people to marry (Zablocki), and had discriminated against new residents exercising their right to travel (Shapiro). Likewise, Florida's statute creates two classes of citizens: one of whom (heterosexuals) is allowed to form intimate relationships without any penalties, while the other (homosexuals) must choose between being considered as an adoptive parent and the ability to enter or remain in an intimate relationship. Therefore, Zablocki and Shapiro demonstrate that Florida's law can be analyzed using heightened scrutiny under either the Equal Protection or Due Process clauses.

85

Birch in his Special Concurrence in an attempt to fill the gaps in the panel opinion rebuts this conclusion.[57]

In sum, given the Lawrence Court's recognition of the fundamental nature of the liberty interest of consenting adults to engage in homosexual relationships, Florida's statute must be subjected to heightened scrutiny. The statute in this case imposes a direct, substantial and severe burden on the right recognized in Lawrence. Florida's adoption ban forces a choice between the right to participate in a consensual, private, intimate relationship and consideration for parenthood through adoption. In effect, under the Florida statute, homosexual men and women must forgo the consideration given to all others to be adoptive parents in order to engage in conduct protected by the Fourteenth Amendment. The

---

[57] See Special Concurrence by Judge Birch to Denial of Rehearing En Banc at *30-31. These three cases – Sell v. United States, 539 U.S. 166 (2003); City of Chicago v. Morales, 527 U.S. 41, (1999); and Youngberg v. Romeo, 457 U.S. 307 (1982) – do not have any application to the issue before us. In Morales, a municipality passed an ordinance that allowed police officers to order individuals who were loitering on street corners to disperse if an officer reasonably believed that at least one of the individuals was a gang member. The Court invalidated the statute on vagueness grounds, finding that the ordinance "affords too much discretion to the police and too little notice to citizens who wish to use the public streets." Morales, 527 U.S. at 64. Thus, the Court never reached the issue of whether the city had violated a liberty interest in loitering, and so had no occasion to address the appropriate level of scrutiny for analyzing such a claim. The other two cases, Youngberg and Sell, involved individuals already in government custody, with very different implications for the liberty interests at stake. See Youngberg, 457 U.S. at 309 (involving a severely mentally retarded adult in a state mental institution); Sell, 539 U.S. at 171 (involving a prisoner opposed to forced anti-psychotic medication). Neither case says anything about the appropriate level of scrutiny for claims raised by autonomous, free adults making decisions about private sexual conduct.

Constitution does not permit such a choice unless, under heightened scrutiny, a compelling and narrowly tailored justification has been found. As demonstrated above, not only is there no compelling interest to justify the Florida adoption ban, but the law is not even rationally related to the governmental purposes asserted. As such, Florida's ban on homosexual adoption fails both heightened scrutiny and rational basis review.

MARCUS, Circuit Judge, Dissenting from the Denial of Rehearing En Banc in which TJOFLAT and WILSON, Circuit Judges, join:

I believe there is a serious and substantial question whether Florida can constitutionally declare all homosexuals ineligible to adopt while, at the same time, allowing them to become permanent foster parents, and not categorically barring any other groups such as convicted felons or drug addicts from adopting. There is undeniably an important question whether this statutory scheme meets a minimal standard of rational basis review. Accordingly, I dissent from the denial of rehearing en banc.